Appeal Nos. 12-15769 & 12-15770 (Consolidated)

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

| | |
|---|---|
| M.M. & E.M., individually and on behalf of their minor son C. M.,<br><br>Plaintiffs/Appellants,<br>vs.<br><br>LAFAYETTE SCHOOL DISTRICT, & LAFAYETTE BOARD OF EDUCATION,<br><br>Defendants/Appellees. | **APPELLANTS' OPENING BRIEF (Consolidated)**<br><br>[20 U.S.C. §§ 1400-1482]<br><br>Appeal from the Northern District of California Case # C10-04223 |
| M.M. & E.M., individually and on behalf of their minor son C. M.,<br><br>Plaintiffs/Appellants,<br>vs.<br><br>LAFAYETTE SCHOOL DISTRICT, LAFAYETTE BOARD OF EDUCATION, CALIFORNIA DEPARTMENT OF EDUCATION (CDE), JACK O'CONNELL, as State Superintendent of Public Instruction.<br><br>Defendants/Appellees. | Appeal from the Northern District of California Case # C09-04624 |

LINA FOLTZ, Attorney-At-Law, (SB# 167813)
11 Embarcadero West, Suite 230
Oakland, California 94607
Telephone: [510] 663-7199
Facsimile: [510] 444-8102
Attorney for Appellants M.M.& E.M. & C.M.

## TABLE OF CONTENTS

I. JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III. STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

IV. QUESTIONS PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

V. ARGUMENT SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

VI. STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

VII. FOUNDATIONAL IDEA LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

VIII. LSD DEFENDANTS' WITHHOLDING OF CM'S RTI DATA VIOLATED THE IDEA PROCEDURAL & SUBSTANTIVELY . . 36

A. Determining A Severe Discrepancy Required Corroboration By RTI Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

B. Section 1414 Required Consideration Of RTI Data Because It Was Relevant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

C. Withholding Of CM's RTI Data Prevented Meaningful Parent Participation At CM's Initial And Subsequent IEP Meetings . . . . . . . 39

IX. ALJ ALTERATION OF HEARING ISSUES VIOLATED §1415 . . 41

X. TEACHER TESTIMONY WAS INADMISSIBLE & INSUFFICIENT TO PROVE PRIOR WRITTEN NOTICE . . . . . . . . . . . . . . . . . . . . . . 42

XI. THE DISTRICT COURT ERRED IN AFFIRMING CM'S CLAIMS WERE TIME-BARRED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

XII. LSD DEFENDANTS VIOLATED CHILD FIND . . . . . . . . . . . . . . . . . 47

**XIII. CM'S INITIAL EVALUATION DID NOT SATISFY THE IDEA . . .48**

**A. CM's Initial Evaluation Did Not Identify His Individual Needs . . .48**

**B. LSD's Intern Was Not Qualified To Conduct CM's Initial IDEA Evaluation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .52**

**C. LSD's Initial Evaluation Was Defective & Inaccurate . . . . . . . . . . .54**

**XIV. CM'S INITIAL IEP DID NOT SATISFY § 1414(d) REQUIREMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55**

**XV. CM'S MARCH 2008 IEP DID NOT SATISFY § 1414(d) . . . . . . . . . . 57**

**A. LSD Prevented Meaningful Parent Participation By Failing to Document Meeting As An IEP Team . . . . . . . . . . . . . . . . . . . . . . . . . 59**

**B. CM's Interim IEPs Did Not Offer CM A FAPE . . . . . . . . . . . . . . . . 60**

**XVI. CM'S SECOND ANNUAL REVIEW IEP DID NOT OFFER CM A FAPE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61**

**XVII CM IS ENTITLED TO REIMBURSEMENT FOR APPROPRIATE PARENT FUNDED ASSESSMENTS AND EDUCATIONAL SERVICES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62**

**XVIII THE DISTRICT COURT ERRED IN DISMISSING CM's § 504 RETALIATION CLAIM REGARDING FACILITATED IEP MEETINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62**

**XIX. CM's CLAIMS OF ERROR WERE NOT MOOT OR WERE EXCEPTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64**

**A. CM's Claims Brought Pursuant To § 1415(i)(2) Presented A Live Controversy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65**

**B. Collateral Consequences Prevented CM's Claims From Being Moot .67**

C. **If Moot, CM's IEE Reimbursement & Reassessment Claims Are Excepted As Capable of Repetition Yet Evading Review** . . . . . . . . . . 70

**XX. THE ALJ ERRED IN REDUCING CM'S REIMBURSEMENT & AUTHORIZING THE LSD'S REEVALUATION** . . . . . . . . . . . . . . 71

**XXI. THE DISTRICT COURT ERRED IN ENTERING JUDGMENT ON CM'S §504 RETALIATION CLAIMS** . . . . . . . . . . . . . . . . . . . . . . . . . . 72

**XXII. THE DISTRICT COURT ERRED IN DISMISSING, PURSUANT TO RULE 12(b), CM'S IDEA CLAIMS AGAINST CDE DEFENDANTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

**XXIII. CM STATED AN IDEA CLAIM AGAINST CDE DEFENDANTS FOR BREACH OF THEIR DUTY TO CONDUCT OVERSIGHT BY INVESTIGATING CM'S COMPLIANCE COMPLAINT** . . . . . . . . . 74

**XXIV. CM STATED OR COULD STATE A CLAIM AGAINST CDE DEFENDANTS FOR SYSTEMIC DENIALS OF IDEA PROCEDURAL SAFEGUARDS IN ADMINISTRATIVE HEARINGS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

**XXV. THE DISTRICT COURT ERRED DENYING FULL ATTORNEY FEES TO CM AS PREVAILING PARTY IN OAH-1** . . . . . . . . . . . 77

**XXVI. CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

## TABLE OF AUTHORITIES

**CASES**:

*Abu-Sahyun v. Palo Alto Unified Sch. Dist*, 843 F.2d 1250 (9th Cir. 1988) . . . . 77

*Bd. of Edu. Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176 (1982). . 34

*Cammermeyer v. Perry*, 97 F.3d 1235 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . 67

*County Sch. Bd. v. Z.P.*, 399 F.3d 298 (4th Cir. 2005) . . . . . . . . . . . . . . . . . . . . 44

*Dept. of Edu., of Hawaii v. Rodarte*, 127 F.Supp. 2d 1103 (D.Haw. 2000) . 67-68

*Flast v. Cohen*, 392 U.S. 83 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

*Florence County Sch. Dist. v. Carter*, 510 U.S. 7, 10 (1993) . . . . . . . . . . . . . . . .57

*Franklin v. Gwinnett County Pub. Sch.*, 503 U.S. 60, 68 (1992) . . . . . . . . . . . . . 75

*Graham v. DaimlerChrysler Corp.*, 34 Cal.4th 553 (2005) . . . . . . . . . . . . . . . . 79

*Knable v. Bexley City Sch. Dist.*, 238 F.3d 755 (6th Cir. 2001) . . . . . . . . . . . . . 44

*Michael P. v. Dept. of Edu.*, 656 F.3d 1057, 1060 (9th Cir. 2011) . . . . . . . . 35, 38

*N.B. v. Hellgate Elementary Sch. Dist.*, 541 F.3d 1202 (9th Cir. 2008) . . . . 34, 58

*PUC v. FERC*, 100 F.3d 1451 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . 64, 66

*Payne v. Penninsula Sch. Dist.*, 653 F.3d 863 (9th Cir. 2011) . . . . . . . . . . . . . 1, 63

*Porter v. Bd. of Trustees of the Manhattan Beach Unified Sch. Dist.*, 307 F.3d 1064 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73-74

*S-1 v. Spangler*, 832 F.2d 294 (4th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . 67

*Thomas v. City of Tacoma*, 410 F.3d 644 (9th Cir. 2005) . . . . . . . . . . . . . . . . 77-78

*Union Sch. Dist. v. Smith*, 15 F.3d 1519 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . 44

*U.S. v. Ford*, 650 F.2d 1141 (9th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

*White v. White*, 925 F.2d 287, 290 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . 68

*Wiggins v. Rushen*, 760 F.2d 1009 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . 70

## STATUTES & REGULATIONS

FEDERAL

United States Codes Annotated (West 2012)

Title 20 United States Codes:

20 U.S.C. § 1400(c)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 41

20 U.S.C. § 1401 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34,49

20 U.S.C. § 1403(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74, 76

20 U.S.C. § 1412 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47, 73-74, 76

20 U.S.C. § 1414 . . . . . . . . . . . . . . . . . 34, 36, 39-40, 44, 46, 54-59, 63-64, 71-72

20 U.S.C. § 1415 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

20 U.S.C. § 6301 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 56, 59

Title 29 United States Codes

29 U.S.C.A. § 794 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

Title 42 United States Codes

Federal Rule of Evidence 601 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Federal Rule of Evidence 406 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42-44

Code of Federal Regulations

34 C.F.R. § 300.8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

34 C.F.R. § 300.9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 45-46

34 C.F.R. § 300.151 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

34 C.F.R. § 300.152 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33-34, 75

34 C.F.R. § 300.311 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36-37, 39, 41

34 C.F.R. § 300.502 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 71-72

STATE

California Education Code (West Supp. 2012)

Edu. Code § 44001.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Edu. Code § 44225 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Edu. Code § 56100(j) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

Edu. Code § 56320 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Edu. Code § 56321 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 45, 60

Edu. Code § 56324 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Edu. Code § 56341 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57-58, 63

Edu. Code § 56507 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

California Evidence Code (West Supp. 2012)

Evid. Code § 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 45

California Code of Regulations

5 C.C.R § 3029 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

5 C.C.R § 3030(j) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 38, 49

5 C.C.R § 4650(a)(7). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

## I. JURISDICTION

Pursuant to 28 U.S.C. § 1291, the Court of Appeals has jurisdiction to review the two final judgments entered by the United States district court for Northern California and consolidated for this appeal. Federal jurisdiction is based upon 20 U.S.C. § 1415(i) of the Individuals with Disabilities Education Act (IDEA) and §504 of the Rehabilitation Act, 29 U.S.C. § 794.

## II. STANDARD OF REVIEW

This Court reviews the district court's grant of summary judgment *de novo*. *Mark H. v. Hamamoto*, 620 F.3d 1090, 1096-1097 (2010), *citing Weiner v. San Diego County*, 210 F.3d 1025, 1028 (9th Cir. 2000). In the appeal from summary judgment, the Court reviews facts in the light most favorable to appellant's case. *Payne v. Penninsula Sch. Dist.*, 653 F.3d 863, 865 (9th Cir. 2011).

The Court of Appeals reviews *de novo* the district court's dismissals, for failure to sate a claim under Rule 12(b)(6), accepting all facts alleged in the complaint as true and construing them in the light most favorable to the plaintiff. *Cholla Ready Mix, Inc. v. Civish*, 382 F.3d 969, 973 (9th Cir. 2004). *See also, Hoeft v. Tucson Unified Sch. Dist.*, 967 F.2d 1298, 1303 (9th Cir. 1991)(When mixed question of law and fact is predominantly a question of law, review is *de novo*). The district court's attorney fees award is reviewed under the abuse of discretion standard.

## III. STATEMENT OF THE CASE

These consolidated appeals concern a severely dyslexic child, CM, and his family's struggle to access benefits of public education from kindergarten in fall of 2005, to summer of 2009 and completion of third grade in the Lafayette School District (LSD). These appeals continue the odyssey of CM and his parents (collectively, CM) to obtain special education and related services due under IDEA, 20 U.S.C. §§ 1400-1492,[1] and implementing California law. CM now is thirteen years old and is attending seventh grade in the LSD.

First, this consolidated appeal challenges the district court's entry of summary judgment against CM, on IDEA claims that the LSD and its Board of Education (collectively, LSD Defendants): (a) violated multiple procedural and substantive requirements, in part, by withholding CM's school records and preventing CM's parents' meaningful participation in his educational decisions; (b) denied CM's right to a free appropriate public education (FAPE), between fall of 2005 and summer of 2009, and, (c) breached their IDEA duty to ensure CM's IDEA procedural safeguards were provided.

Second, the appeal challenges the district court's entry of summary judgment on CM's discrimination claims under §504 of the Rehabilitation Act, 29 U.S.C. 794 and

[1]References to the IDEA are to 20 U.S.C.A. §§1400-1482, (West Supp. 2012). References and citations to the California Education Code are to (West Supp. 2012).

its regulations[2], and entry of judgment without addressing CM's retaliation claims, alleging LSD Defendants wilfully violated the IDEA and §504 by obstructing CM's IDEA right to an independent educational evaluation (IEE) and pursuing a reevaluation of CM on pretense, through procedures that violated IDEA. CM challenges the district court's earlier dismissal, pursuant to Federal Rule 12(b)(6), of §504 retaliation claims against LSD Defendants for alleged conduct causing closure of CM's IDEA California Department of Education (CDE) compliance complaint and requiring facilitated IEP team meetings.

Third, CM appeals the district court's earlier dismissal of CM's claims against the CDE and its Superintendent[3] (CDE Defendants), pursuant to Federal Rule 12(b)(6). CM seeks this Court's determination that CM can state a claim against CDE Defendants for their alleged violation IDEA's mandate to complete their investigation and by failing to order corrective action. CM further appeals the district court's Rule 12(b)(6) dismissal of claims that CDE Defendants breached their IDEA duty to establish and maintain policies and procedures (a) to ensure that the Lafayette School District and its Board provided CM's IDEA procedural safeguards and (b) to ensure that the IDEA administrative hearing process ensured IDEA procedural

[2]CM's § 504 discrimination claim further is based upon alleged violations of regulations implementing §504. 34 C.F.R. §104.33 (2012), (ER671-673, ¶¶224-241).

[3]Superintendent of Public Instruction, Tom Torlakson, currently hold the public office of former Superintendent Jack O'Connell.

safeguards were provided and that the process is fair. Each underlying district court case concerns discrete legal issues based upon common facts.

By Appeal, 12-15769 (OAH-2), seeks reversal of the district court's entry of summary judgment, which affirmed a final administrative decisions holding: (a) CM's claims arising prior to April 18, 2007 were time barred (ER253-255); (b) CM's initial IDEA evaluation satisfied the IDEA; and, (c) the LSD Defendants did not violate the IDEA to deny CM a FAPE from April 18, 2007 through June 2009. (ER139-187). CM also seeks reversal of the district court's entry of summary judgment on CM's IDEA and § 504 retaliation claims and § 504 discrimination claim.

By Appeal 12-15770 (OAH-1), CM seeks reversal o f (1) the district court's orders dismissing, pursuant to Rule 12(b), CM's claims of retaliation under § 504 and alleged violation of LSD Defendants' IDEA duty to ensure CM's IDEA procedural safeguards were provided; (2) reversal of the district court's entry of summary judgment, based upon finding CM's claims of ALJ error were mooted by subsequent events; (3) this Court's determination that the ALJ erred as a matter of law in the determination of issues found moot; and (4) reversal of the district court's post-judgment order reducing and offsetting CM's attorney fees award to no recovery, with instructions to award reasonable attorney fees to CM.

CM requests this Court's determination that the Administrative Law Judges (ALJs)

in each underlying case erred and CM is entitled to relief as a matter of law or upon facts not subject to dispute. CM requests attorney fees as prevailing party on all causes.

## IV. QUESTIONS PRESENTED

**Preliminary Questions In Both Appeals**:

1. Did the IDEA require the LSD Defendants to provide CM's Response-to-Intervention (RTI) data to his parents when CM participated in the RTI process?[4] (ER32:1-19, *see also* 28:1-8; 30:16-27; 34:1-35:8).

2. DID The ALJs alteration of hearing issues *sua sponte* violate the IDEA? (ER17:6-18:5).

3. Did the district court err in finding testimony constituted "habit" evidence, pursuant to Federal Rule of Evidence 406, and satisfied the IDEA's written prior notice requirement for providing procedural safeguards ? (ER27:3-10; 542:5-14).

**Appeal 12-15769**: (C10-04223-SI, **OAH-2**[5])

4. Did the district court err in affirming dismissal of CM's claims arising prior to April 16, 2007, as time barred? (ER26:6-28:12; ER23, n.15).

5. Did the district court err in affirming in OAH-2 that CM's initial evaluation

---

[4]LSD Defendants' obligation to provide RTI data to CM's parents is stated first because it is integral to his claims within each appeal.

[5]The district court referred to OAH I and OAH II/III. For simplicity here, OAH-1 refers to the LSD's administrative case against CM. OAH-2 refers to CM's consolidated administrative case against the LSD, filed in two parts to satisfy IDEA's two-year limitations period after OAH-1 commenced. CM discusses OAH-2 first.

satisfied IDEA requirements, even though the issue had been dismissed as time barred? (ER14:27-15:9; 22:6-23:7; 23:21-25:21; 29:6-30:25; 32:1-25; 146-153; 178 ¶7-178; 265; 536:20-538:3; 538:5-539:3; 543:7-21; 544:1-10;563:17-564:1).

6. Did the district court err in affirming that a student intern in school psychology was qualified to administer CM's individual tests of intellectual and social emotional functioning despite California's statutory requirement for such testing to be administered by a credentialed school psychologist? (ER22:11-23:9; 154, ¶5).

7. Did the district court err in affirming that neither withholding CM's RTI data nor a student intern acting as a school psychologist denied CM's parents meaningful participation in CM's initial IEP team meeting on April 18, 2007. (ER32:2-19; 33:15-35:9; 155 ¶3-157)

8. Did the district court err in affirming that CM's initial IEP of April 18, 2007 satisfied § 1414(d) of the IDEA and provided a FAPE? (ER35:12-36:7; 157-161).

9. Did the district court err in affirming that CM's first annual IEP of March 18, 2008 satisfied § 1414(d) of the IDEA and provided a FAPE? (ER40:19-41:3; 161-163).

10. Did the district court err in affirming that the LSD was not required to document staff meeting in spring 2008 with CM's mother? (ER41:6-42:1; 162 ¶3-163 ¶4).

11. Did the district court err in affirming that CM's March 2009 IEP satisfied IDEA requirements and provided CM a FAPE. (ER46:15-47:23; 171-172).

12. Did the district court err in affirming that the ALJ properly excluded witness testimony deemed untimely pursuant to an OAH's prehearing conference policy when CM's notice was timely under the IDEA and California law? (ER58:11-24).

13. Did the district court err in granting summary judgment on CM's claim alleging prohibited retaliation under § 504 of the Rehabilitation Act by LSD Defendants' conduct in seeking a stay of CDE's investigation. (ER43:45:18-46:13).

14. Did the district court err in dismissing, pursuant to Rule 12(b)(6), CM's claims that the LSD Defendants breached their IDEA duty to establish and maintain policies and procedures to ensure that IDEA procedural safeguards were provided after CM requested an IEE? (ER67:1-68:14;113:10-115:2).

15. Did the district court err in dismissing, pursuant to Rule 12(b) for failure to exhaust IDEA administrative remedies, CM's claims that LSD Defendants' use of facilitated IEP team meetings constituted prohibited retaliation under §504 of the Rehabilitation Act? (ER70:23-71:2).

16. Did the District court err in affirming by summary judgment that CM was not entitled to reimbursement for outside assessments by Dr. Loomos in audiology, for Dr. Swain in processing, and/or by Lindamood-Bell in evaluating CM's reading intervention needs? (ER47:25-48:9).

17. Did the District court err in determining by summary judgment that CM was not entitled to reimbursement for parent-funded remedial educational services from

Dr. Swain for Tomatis Therapy and/or from Lindamood-Bell Processes remedial reading services? (ER47:25-48:9).

18. Did the District court err in determining by summary judgment that CM was not entitled to compensatory educational services? (ER47:25-48:9).

**Appeal 12-15770**: District court Orders on ALJ Marsen's Decision

19. Did the LSD's Defendants' payment of the reduction amount, during district court review, render moot CM's claim of error by an ALJ ordering 50% equitable reduction in CM's IEE reimbursement? (ER12:20-14:19).

20. If the issue is not moot, did the ALJ err and/or exceed his jurisdiction by ordering 50% equitable reduction in CM's IEE reimbursement? (ER264-265, 271-272).

21. Did completion of an agreed-upon triennial IDEA reevaluation in 2010 render moot the issue of whether the ALJ erred in authorizing LSD to reevaluate CM under the September 24, 2008, assessment plan prepared by a school administrator. (ER12:16-19; 14:5-19).

22. If the issue is not moot, did the ALJ err in determining that the LSD could evaluate CM pursuant to its September 24, 2008 assessment plan? (ER17:6-18:5; 570:11-18; ER266-268, 272-273).

23. Did the ALJ err by failing to determine the "appropriateness" of CM's initial assessment in 2007? (ER14:27-15:9; 265,¶36; 563:19-22:567:22-569:16).

24. Was CM entitled, as prevailing party, to recover attorney fees from LSD Defendants

in OAH-1 because he prevailed on all or related issues?

25. Is CM prevailing party entitled to recover attorney fees on issues deemed moot based upon California law adopting the "catalyst theory," under the California Supreme Court holding in *Graham v. DaimlerChrysler Corp.*, 34 Cal.4th 553 (2005)? (ER91-102).

26. Did the District court err in striking CM's claim for expert witness fees sought under the IDEA? (ER130:9-22).

**Appeal 12-15770**: (C09-04624-SI) Regarding CDE DEFENDANTS:

27. Did the District court err in dismissing, pursuant to Rule 12(b)(6), CM's claims that CDE Defendants violated their IDEA duties by staying and closing their investigation of LSD Defendants' unnecessary delay after CM requested an IEE?" (ER131:5-132:24).

28. Did the District court err in dismissing, pursuant to Rule 12(b), finding that CM could not state a claim against the CDE for its failure to complete its investigation of CM's compliance complaint? (ER131:5-10; 131:18-132:24).

29. Did the District court err by dismissing, pursuant to Rule 12(b), CM's claims that CDE Defendants, pursuant to Federal Civil Procedure Rule 12(b), for CDE Defendants' alleged failure to conduct oversight of OAH and the Lafayette Defendants? (ER131:10-12; 132:25-133:22; 1150:15-1151:11).

## V. ARGUMENT SUMMARY

CM seeks determinations here that:

(1) The record in Appeal 12-15769 established, LSD Defendants violated CM's IDEA rights, procedurally and substantively, thereby denying CM a FAPE from 2005 in kindergarten, through third-grade in June 2009, entitling him to relief, including reimbursement for educational assessments and services and compensatory education, and should be prevailing party on all issues alleged in his administrative complaint;

(2) Issues raised in CM's district court action underlying Appeal 12-15770 were not moot, or were excepted from being moot, and CM should prevail on each administrative issue alleged by the LSD Defendants administrative complaint;

(3) CM can state a claim under the IDEA, against CDE and LSD Defendants for breach of their IDEA duties and violations of CM's right to IDEA procedural safeguards;

(4) CM's claims, that LSD Defendants violated §504 of the Rehabilitation Act through retaliation and discrimination, should go forward in the district court;

(4) CM can state a claim against CDE Defendants for breach of their IDEA duty to conduct oversight of the hearing process, and ensure IDEA procedural safeguards;

(5) CM is entitled to recover reasonable attorney fees and costs as prevailing from LSD Defendants, in administrative each case; and

(6) Questions of fact precluded summary judgment on §504 retaliation claims and any IDEA claims not be resolved as matters of law or upon undisputed facts.

# VI. STATEMENT OF FACTS

## A. CM's Educational History Prior To Eligibility Under The IDEA

### CM's 2005-2006 School Year, Kindergarten

CM was six years old when he began kindergarten at Lafayette Elementary School (LES) in August 2005 after an extra year of preschool. (ER2:4-5; 3026:5-13; 2994:16-22; 3176:18-3177:8). At six, CM began kindergarten "with quite a bit of knowledge for letters," compared to some who knew only 2-3 letters. (ER 2159:15-24).[6]

Beginning in CM's kindergarten year, Reading Specialist Carol Harris conducted "universal assessments" at LES three times each school-year for students in kindergarten through fifth grade. (ER2147:2-21; 2166:10-24; 2320:7-2321:22; 2995:12-2997:23; 2998:4-8). Each school year started with universal assessments and staff participated in "Assessment Wall" meetings each October, December and March. (ER2998:18-24; 2996:3-6). LES staff used "universal assessment" data to "pinpoint children that need support beyond . . . general instruction" and to "guide intervention" provided to children whose testing showed strategic or intensive needs. (ER 3008:20-3010:11). Reading Specialist Harris decided how to target "instruction and intervention to support the child." (ER3034:3-3035:14).[7]

[6]CM knew about 22 uppercase and 17-18 lowercase letters. (ER2159:21-22).

[7]Ms. Harris used the Houghton-Mifflin "Extra Support Handbook" from the LSD's adopted reading series and "flushed it out with other activities from other sources." (ER 2205:5-2207:5). For first graders, Ms. Harris also used Project Read materials to practice decoding tasks, Orton-Gilliam flip cards to practice "nonsense words," and the group read a book everyday. (ER2207:6-2208:7).

LES' School Principal Maddux, Reading Special Harris, Instructional Support Teacher (IST) Jane Jones[8] participated "assessment wall"[9] meetings with teachers at each grade-level where they discussed results from LES' universal assessments and interventions for children performing below benchmark. (ER 2995:12-22; 2996:3-18; 2997:7-14). The LES' process for universal assessments, assessment wall meetings and providing corresponding intervention, constituted "Response to Intervention" (RTI) that staff employed throughout CM's kindergarten through third-grade years. (*Id.*; ER2; *see also* ER476, 483-485). Staff notes from assessment wall meetings are not placed with student's records. (ER3021:8-3022:5). The LES implemented RTI as an intermediate step before obtaining a special education evaluation and placement. (ER2169:8-12; 2209:10-17; 3035:15-3036:7).

In kindergarten, Reading Specialist Harris tested CM to determine his academic achievement in comparison to grade-level benchmarks called using the DIBELS (Dynamic Indicators of Basic Early Literacy Skills). (ER 2148:13-24; 2158:2-5; 3010:12-3011:17). CM's DIBELS testing on August 31, 2005, January 31, 2006 and May 23, 2006 ranked

---

[8](Susanna) Jane Jones' job title was "Instruction Support Teacher" or IST, based upon her training as a Resource Specialist and services she provided for learning disabled children. (ER2245:2-2246:4). Ms. Jones is denoted in various record documents as an IST or RSP and is referred to herein as an IST.

[9]"... an assessment wall meeting is a time when we can have the dialogue [about special education referral]. Normally what happens is our strategic and our intensive kids, we support them where they need support. We usually track on their cards with a sticker what support they're getting." (ER3020:15-25). "Intensive designates students who are "well below grade level." (ER3000:4-11).

CM as "strategic[10]" level for each period. (ER1540.1; ER 2148:13-24, 2158:2-5; ER 1624-1624.6). CM received extra assistance, in class, and interventions from Ms. Harris beginning in his first trimester of kindergarten for "strategic" needs identified from CM's universal assessments. (ER2:7-8; ER1623; 1540.1; 1624.5–1624.6; ER2159:6-2160:10).

LES staff did not inform CM's parents that CM underwent universal assessments or that staff discussed CM's identified needs and response to intervention at assessment wall meetings. (ER2809:1-8; ER470, ¶5; 3021:8-3023:13; 3033:5-16). The LES withheld CM's universal assessment reports and printed data, from kindergarten through CM's third-grade school year. (ER469-471, ¶¶1-10; 432-465; 614-615; 619-620; 623-624, ¶3–6; 2808:19-25; 2822:11-2823:7).

LES relied upon teachers to convey any RTI information to parents about their child, and a teacher or IST Jones might discuss universal assessment information when a child was receiving Tier 3 support.[11] (ER3022:6-3023:10; 3023:11-13). The written information teachers provided to CM's parents was incomplete and misleading for CM's parents to understand the reasons for his struggle and individual needs.[12] (ER1622-1623; 1618-1619; 1614; 1600-1602; 1539-1540; 1526; 1522-1522.1; 1503; 1475:6-1476:11; 1338, 1335;

[10] "Strategic" ranking meant that out of the areas tested, there's one, possibly two areas, that need to be addressed." (ER 2158: 2-5).

[11] Tier 3 support is synonymous with special education services but also was provided without an IEP being in place. (ER 2208:18-2209:7).

[12] LSD did not submit evidence to show teachers ever told CM's parents about its RTI process or CM's participation in universal assessments.

1303; 1301; 1297; 1295; 1280-1281, *compare e.g.*, 1333-1334) It did not advise CM's that staff collected RTI data or what it showed. CM's report cards noted CM was struggling, but assured CM's parents that CM was making progress and approaching proficiency nonetheless.

CM's first trimester report for kindergarten stated that CM knew most of his uppercase and lower case letters, although CM began kindergarten knowing most letters.[13] (ER1622-Reading; 1623-Narrative T1, ¶2; ER 2159:19-22).[14]At the end of kindergarten, CM's teacher reported "solid growth in both his CM language arts and mathematical skills," and CM was promoted to the first grade. (ER1623). The report card did not mention CM's DIBELS tests or "strategic" ranking. (ER1622-1623; ER3025:21-24, 3027:1-3029:7, 3033:5-12). CM attended a special summer school class for additional intervention to address his needs in language arts, by invitation. (ER3040:6-3041:7; *see also* ER2:8-9).

**<u>CM's 2006-2007 School Year, First Grade</u>**

Beginning in August 2006, CM attended Ms. McClure's first-grade class as the

---

[13]Principal Maddux testified, CM's kindergarten report card revealed strategic needs and knowledge of letters at or near grade-level, but all information was important because CM was struggling. (ER3027:6-3029:7).

[14]CM was "getting intervention and support from Mrs. Harris as well as small group support in class." (ER1623-T1) ". . . getting extended intervention and support through the reading lab, small reading groups and speech, . . . written and fine motor activities tend to be frustrating . . . , but he strives hard to complete his assignments." (ER1623, T2).

oldest student. (ER 3916; ER1621).[15] Ms. McClure referred CM for a special education evaluation at the beginning of his first-grade year. (ER 3165:7-16; 3166:20-3167:3). CM received guest services with IST Jones, who used various teaching strategies. (ER1451:14-1452:6).

In September 2006, Ms. Harris assessed CM using three types of DIBELS[16] tests. (ER1621.1; ER1540-1540.1).[17] On October 12, 2006, Ms. Maddux, Ms. Harris, Ms. Jones and Ms. McClure met about teacher concerns and scheduled an SST[18] meeting for November 8, 2006. (ER1621; 3046:5-19[19]).

On or about, October 26, 2006, CM's parents submitted a written request for testing to "define any inherent challenges" related to CM's learning difficulties. (ER 1620). On November 8, 2006, LES convened CM's first SST meeting with CM's mother (EM), but

---

[15]CM's parents told Ms. McClure their concerns that CM was being bullied on the playground. (ER3132:7-3133:10; 2807:2-2808:1).

[16]LES documents identified a SORT score of "0" for CM in October of his first-grade year, but that score was not reported in documents shared with CM's parents. (ER 463 ("SORT Fall 06: 0.00"), 1333, 1522.1, 1539.1, 1547, 1599, 1614, 1619, 1623; *see also* 469-471, ¶¶1-10; 623-624, ¶3).

[17]The September DIBELS testing, yielded "low risk" scores in CM's "letter naming" and "nonsense word" skills and "Benchmark" in "phoneme segmentation." (ER 1621.1).

[18]A Student Study Team (SST) meeting was LES' initial process for a special education evaluation referral. (ER3020:9-25).

[19]EM testified CM had been bullied at school. (ER2890:2-19).

did not propose an assessment plan. (ER1618-1619).[20] In late-November, CM's report card stated, CM was a very enthusiastic science learner, loved sharing, was often kind to others, continued to work hard toward grade-level standards and was receiving "additional support." (ER1539.1; 3032:19-21). The report card did not reveal CM's universal testing. (*Id.*).

In January and February 2007, the LES tested CM in three DIBELS categories and administered the Slosson Oral Reading Test or SORT "List P," twice, and a "Phonic Production Inventory." (ER). (ER1617.1-1617.5; 1615-1617; 1540.1[21]). Staff did not provide CM's DIBELS, SORT or Phonics tests. (ER469-470; 427,¶4-6; 2808:19-25).[22]

On February 8, LES staff met with EM for a second SST meeting.[23] (ER1614). LES

---

[20]EM provided information that they were trying "Kumon Jr.," a self-paced program for children who are not reading. (ER1618; ER2810:16-2811:18). The SST notes listed CM's "1st screening DIBELS-Benchmark," omitting domains tested and scores, and comments on CM's kindergarten achievements and needs. (ER1619).

[21]CM's first-grade scores for "Phoneme Segmentation Fluency" were above benchmark levels on universal testing in CM's first and second trimesters, but CM demonstrated weakness in "Oral Reading Fluency," and "Nonsense Word Fluency," resulting in "strategic" ranking. (ER1617.1-1617.4, 1540.1; 2179:2-2181:4).

[22]LSD argued the references to some RTI data provided sufficient RTI information in isolated reports of some SORT and DIBELS scores. However, it appears undisputed that LSD withheld RTI documents and produced them after educational decisions for CM's relevant school years, including documents admitted to supplement the administrative record. (ER596.2:4-13; 623-624, ¶3).

[23]EM testified that she would have "voiced her concerns" about CM's auditory processing at the February SST meeting and that she had discussed her concerns about CM's auditory processing as an area of potential deficit for CM prior to 4/18/07. (ER3833:11-18; 3824:10-15).

listed some test scores: SORT score of .3;[24] 13 WPM,[25] Consonant sounds 23/23, Vowels 10/10, Readiness Words 29/39 and, DIBELS-Strategic. (ER1614; 2309:18-21). Although general discussion took place regarding an evaluation of CM, CM's parents did not receive CM's DIBELS tests or reports of universal testing during this or other relevant school years. (ER2813:5-2817:16; 427, ¶5-6; 469-470, ¶1-7; 2822:11-2823:7).

On or about February 20, 2007, Ms. Jones hurried EM to sign CM's assessment plan to get CM's assessment started. (ER1612; 2818:8-2821:8; 3816:18-3818:10; 624, ¶9). EM scanned the assessment plan, signed it as Ms. Jones requested, and read it again later. (ER2818:1-10; ER2832:16-21; 3816:24-3818:10; 3836:20-3837:17). EM received a copy of the assessment plan and the form entitled "Notification of Special Education Referral", but CM's parents did not sign that form. (ER 2819:15-24; 3819:19-3820:6; 1613).[26]

EM testified that she did not receive a notice of parental rights on February 20, 2007. (ER 2820:6-17). LSD did not produce or maintain copies of written notice of procedural

[24]CM's SORT score of .3 signified identification of single words at first grade, third-month level. (ER2309:22-2310:21). First-grade covered a 0.0 to 1.9 range. (*Id.*).

[25]13 WPM indicated CM's words-per-minute reading rate, which was "significantly low." (2310:22-2311:12).

[26]Ms. Jones testified that her practice would have been to provide a notice of "parents' rights" at the time she met with a parent to sign an assessment plan. However, Ms. Jones could not recall any meeting with EM in connection with CM's assessment plan. (ER2593:7-2594:13, 2595:4-17). LSD did not document providing any notice of procedural safeguards to CM's parents prior to 4/18/2007. (ER 2595:11-14; 2596:3-6; ER1542).

safeguards or any document acknowledging the parents' receiving notice of procedural safeguards. (ER 2595:11-14; 2596:3-6; ER1542).

**B. CM's Initial Evaluation & Eligibility Under The IDEA**[27]

On March 9, 2007, IST Jones evaluated CM's academic achievement with tests from a Woodcock-Johnson Test of Academic Achievement (WJ-III) Form A. (ER1600, 1603-1611). Ms. Jones prepared a report dated March 23, 2007. (ER1599-1602).

On March 16, 23, 26, 28 and April 12, 2007, a student intern in school psychology, Ms. Charpentier,[28] administered psychological testing to CM, including individually administered tests of intellectual and emotional functioning, and compiled a report on the results in consultation[29] with school psychologist Patrick Gargiuolo. (1546-1556; 1588; 1587; 1580; 1561; 1913:3-25; 3551:6-20). Mr. Gargiuolo did not sign the report endorsing the assessment until September 2007. (ER1418 ¶4; 1556). No credentialed school psychologist observed Ms. Charpentier's test administration. (ER3475:11-17;

[27]The district court and ALJ note CM's "struggle to read proficiently." (ER2:1). However, the characterization omits CM's struggles with writing, spelling, mathematics and emotionally responding to his ongoing academic failure in comparison to his peers.

[28]The Intern Charpentier worked at LES under a student intern credential issued by the California Commission on Teacher Credentialing. (ER1641).

[29]Mr. Gargiuolo's "supervision" of Ms. Charpentier consisted of consultations with her regarding testing and her report, but did not include direct observation of her test administration to CM. (ER1912:25-1914:2).

3550:10-13;4014:23-4015:12). CM's parents received a copy of the report on the evening before CM's IEP team reviewed it. (ER2825:3-13).

CM's first IEP team convened on April 18, 2007 to discuss the District's assessment results from testing administered by Ms. Charpentier and Ms. Jones. (ER1542-1545; 2828:24-2831:16). CM's parents learned at the IEP team meeting that Ms. Charpentier had conducted CM's psychoeducational evaluation. (ER 3820:18-25).[30] Mr. Garguiolo could not recall when he signed CM's initial assessment report or whether the report was given to CM's parents before he reviewed it. (ER1912:18-24).[31]

CM initial IEP identified CM's basis of eligibility in a "Specific Learning Disability Summary." (ER1544-1545).[32] The summary included query "b", "Has the student participated in Rti interventions? (Attach documentation)" and is marked "Yes."

[30]On September 17, 2008, CM's parents learned that School Psycholgist Gargiuolo, whose name appeared under the unsigned signature line of the report, had never met CM. (ER 1472:16-1473:2; ER 1555). On September 18, 2008, Dr. Sassone instructed Mr. Gargiuolo to sign all existing copies of CM's initial Psychoeducational Assessment. (ER1418, ¶4).

[31]Supplemental evidence showed that the day after CM's IEE request, Dr. Sassone instructed staff, including Mr. Gargiuolo, "Pat G did not sign report; need all existing copies signed" (ER1418 ¶4).

[32]The form identified Cognitive Ability testing with WISC-IV. (ER1544). Phonological processing is marked as a processing disorder, also known as phonological awareness. (*Id.*; ER2232:4-2233:10). Achievement scores from CM's WJ-III and WRAML-II and CTOPP scores are identified. (ER1544).

(ER1544).[33] The form states:

> VI. "Eligibility: Based on assessments and relevant data, and in accordance with Federal Regulations section 300.306, does the IEP team find that the student has a specific learning disability that requires Special Education? . . . Yes. (ER1545).

| VII. Documentation that parents were notified about: | By: |
|---|---|
| State's policies regarding the amount and nature of the student performance data that would be collected. | Assess Plan |
| The general education services that would be provided. | Pg. 1 IEP |
| Strategies for increasing the child's rate of learning. | Goals |
| The parents' right to request an evaluation. | Parents' Rights |

(*Id.*). EM signed the "Certification of Conclusions," but no CM's IEP did not include RTI documents. (ER1544-1545; 2833:23-2834:4; 2834:17-2835:2; 2835:25-2836:11; 3843:4-3845:21).

CM's initial IEP team meeting lasted approximately 30-45 minutes. (ER 2956:10-16). No RTI data was discussed at the meeting. (ER2835:11-20; ER2832:20-2833:11). IST Jones provided prepared goals and objectives (G&Os), but EM testified that the G&Os were not discussed at the meeting. (ER2837:9-2838:10). EM testified that she discussed her concerns and disagreed with Ms. Charpentier's conclusion that CM did not have emotional needs." (ER3813:13-17; 3823:25-3824:9). CM's IEP did not document

[33]Dr. Sassone testified that the RTI attachments would have been CM's SST notes. (ER3220:24-3221:9). However, as Dr. Sassone did not consider SST notes to be RTI documents when she told Principle Maddux and other staff: "6. ...pls make darker copy of SST notes, can't red them all," and "Eligibility form says that Rti documentation is attached but nothing is attached. Pls attach...." (ER1418, ¶¶6-7).

those concerns. CM's parents consented to the LSD's offer of ISP services four days per week for forty-five minutes per day, believing school staff knew what CM needed. (ER1542; 2838:17-23).

At the end of first grade, CM's report card cited progress but omitted objective RTI documentation. (ER1539.1[34]). Contemporaneous universal assessments ranked CM as "strategic" on DIBELS tests, reading at a rate of twenty words per minute (WPM). (ER1540-1541;1540.1[35]; 2211:23-2212:9). Neither CM's final report card or June 2007 IEP progress reports revealed CM's universal testing. (ER1539-1539.1; 1524[36]; 2337:3-2338:5).

CM's parents obtained tutoring services for CM in summer following first- grade, from Ms. Deasy, a second-grade teacher in the LSD. (ER2840:17-2842:22). CM was happy about receiving tutoring with Ms. Deasey. (ER2845:2-9). EM could not tell whether the tutoring helped CM. RTI data showed his progress on the SORT, but minimal progress in fluency.[37] (ER2845:6-7; 452[38]; 1524; 1538; 1541; 2219:12-17). CM

[34]"[CM] has made steady progress in meeting the standards for his grade level . . . continued to receive support . . . from the reading lab and the resource program . . . has developed new strategies and skills . . . ." (*Id.*)

[35]Ms. Harris provided the DIBELS protocol 1540.1 at hearing when DIBELS sheets CM obtained were indecipherable. (ER2185:18-2186:9; 2187:25-2188:22).

[36]CM's parent did not receive IEP progress reports by mail, but could not recall whether she received them by other means or not. (ER2874.3:1-3; 2874.4:7-11).

[37]IST Jones testified: "When you're only reading 23 words per minute, your comprehension is going to be seriously compromised." (ER2346:8-14). CM's

was not happy to returning to school. (ER2843:23-25).

**CM's 2007-2008 School Year, Second Grade**

In fall 2007, CM entered Ms. Carson's 2nd grade class and EM was a volunteer. (ER1522; 2845:10-2846:12). EM did not receive CM's second-grade universal test reports, but a few scores were included on CM's report card and IEP progress reports.[39] (ER2851:23-2852:5; 2846:25-2847:23; 1522.1, 1524).

During second-grade, EM told LES staff about her ongoing concerns that CM had unidentified issues, particularly auditory processing deficits. (ER1773:2-7: 3834:13-3836:2; 2848:12-2849:3; 2839:7-22; 1527; 1497-1501). CM complained about Ms. Jones class and was embarrassed about being pulled out of his regular class. (ER2850:16-2851:19).

On November 30, 2007, after having CM's hearing tested, EM obtained a "Central Auditory Processing Evaluation" for CM from Dr. Dimitra Loomos. (ER1529, 1535; 2849:4-6; 3814:15-3816:4). Dr. Loomos received completed questionnaires from LES staff to use in her assessment. (ER3773:8-16).

Dr. Loomos diagnosed CM's Central Auditory Processing Disorder (CAPD) in her

---

"WPM" scores, reflected in withheld documents, showed a slight increase during his brief summer tutoring. (ER452; 457; 463).

[38]RTI documents showed CM's SORT, Spring 2007 (May) was 1.0 and improved during summer tutoring to 1.3. (ER463, 457).

[39]EM disputed receiving CM's IEP progress reports. (ER2839:23-2840:16).

report dated December 30, 2007.[40] (ER1529-1536). Using specialized equipment, Dr. Loomos identified CM's impaired ability to "integrate" auditory input within the central auditory nervous across the structures of the brain that manifested in reading and writing deficits. (ER2719:22-2721:25; 2730:6-2733:21; 1531-1532)[41]. CM exhibited a secondary deficit in "binaural separation," resulting in impairment in his ability to filter noise entering his right ear when the target information was presented in his left ear. (*Id.*) Dr. Loomos recommended environmental modifications, direct intervention and compensatory strategies for CM at school. (ER1533-1534).

EM shared Dr. Loomos' report with IST Jones and Ms. Carson as soon as school resumed, and she left a copy at the front desk.[42] (ER2849:7-2850:3). EM met with LES staff and discussed Dr. Loomos' report and EM's concerns. (ER1527; 2852:10-2853:18).

By February 2008, CM's SORT score decreased to 1.1.[43] (ER1528, 457; 2222:3-19;

---

[40]A normal maturation suggests that CM's auditory processing was similarly deficient at the time of his initial evaluation at LES. (ER3777:8-19; 3878:15-17; 3779:16-3780:4).

[41]Dr. Loomos explained her results in OAH-1 and her report at meetings. (ER3780:9-3783:2; 1457:17-1459:14).

[42]LES staff did not note in any correspondence that there ever was delay in receipt of CM's private evaluations. Dr. Sassone first inquired about receipt dates after CM requested an IEE in September 2008. (ER1418, #3).

[43]Other tests in CM's second-grade were also reflected RTI documents, including Spelling, SRI-Reading Comprehension and Summative DRA. (ER457).

2223:3-2226:20). CM's report card stated, "[C's] reading fluence grew significantly[44], . . . Sept. 23WPM, Jan. 44 WPM.[45]" (ER1522.1).[46] "As the Standards become more demanding . . . writing is an extremely difficult area for [CM]," [but] will improve with daily practice and support." (*Id*). CM's IEP progress report listed a 1.3 SORT level, and WPM at 1.3, referencing his level on Read Naturally. (ER1524; 2528:2-9).

On February 27, 2008, Dr. Swain, a speech-language pathologist conducted a Processing Evaluation of CM at his parents' request. (ER1504-1518; 1373). The day after Dr. Swain's evaluation, EM corresponded with LES staff about CM's evaluation. (ER1527, ¶4). EM wanted to "make sure we all have a clear understanding of what his Auditory Processing disorder is." (*Id.*, ¶7). On March 3, 2008, CM began receiving Tomatis[47] therapy through Dr. Swain and continued that therapy until June 27, 2008.[48] (ER2856:15-20; 2857:10-2859:17;1375-1380).

---

[44]IST Jones testified that CM's increase was insignificant and his rate of progress was an area of concern that she would watch closely. (ER2528:16-23).

[45]No test form documented CM's 44 WPM, or the 43 WPM noted on his SORT. (1528). CM's second-grade year-end DIBELS "ORF" (Oral Reading Fluency) was recorded at 32. (*compare* ER457, 463, *see* 429 for DIBELS abbreviations).

[46]CM's SORT score reached 1.2 by the end of second grade and his fluency rate was noted at 40 WPM at the beginning of third-grade. (ER454-457).

[47]Tomatis is supported by peer-reviewed research showing efficacy. (ER1625-40).

[48]EM and staff noticed CM's improved stamina and attentiveness and his teacher knew CM was receiving therapy for CAPD. (ER2859:20-2869:15; 1438:10-1439:11; 1773:9-1774:10).

On March 18, 2008, CM's first annual IEP review meeting convened. (ER1519-1521, 1523; 1398-1400). The written IEP did not document any discussions of assessment, accommodations or progress reports. (ER1519-1521). Staff acknowledged discussing CM's evaluation with Dr. Swain at the IEP meeting. (ER1410.1-1410.2, ¶4; 1504; 1446:12-14). EM consented to undifferentiated services. (ER1520; 1542). Shortly after the IEP meeting, CM's scored below basic on State proficiency tests of second-grade language arts. (ER1502-1503).

EM continued to correspond with IST Jones and CM's teacher about CM's CAPD and recommendations for a speech-language evaluation. (ER1498-1501). On May 15, 2008, EM requested an IEP team meeting to discuss "a few subjects," including CM's need for a speech language evaluation, and "a clear breakdown of his challenges on the IEP [so] we can have a way to evaluate specific progress." (ER1498, entry 3, ¶5). EM provided consent for Dr. Loomos to confer with SLP Gebers about CM's CAPD diagnosis. (ER1498, item 3, ¶5; ).

On or about May 20, 2008, Principal Maddux, IST Jones, SLP Gebers and CM's teacher met with EM. (ER2874.5). The content of discussions at the meeting was disputed at hearing, there was no written record of this meeting or any other IEP meeting before CM's summer break. (ER2874.5-2874.6; 1433:15-1434:11). On May 22, SLP Gebers reported to Dr. Sassone:

The crux of the matter seems to be that [EM] would like the CAPD to be stated as

> the eligibility criteria. She wants it recognized. This seems to be coming from the audiologist and other outside providers who have done this additional testing." (ER1497).

On May 28, 2008, CM's SORT protocol listed a 32 WPM score. (ER1496). CM's report card did not include CM's RTI data,[49] but stated:

> [C] continues to make slow and uneven growth. He is a hard worker . . . One area of growth is his stamina to complete classroom assignments. ... spelling is making progress but continues to be a struggle ... [C] received a 3 on the Summative . . . Reading and re-reading books is a must this summer! (ER1522.1).

**<u>CM's 2008-2009 School Year, Third Grade</u>**

In late-August 2008, CM started third grade in Ms. Bole's class. On August 28, 2008, CM's initial SORT score was 1.9 and his oral reading fluency on DIBELS was recorded as 40WPM. (ER1495; 457, 462).

On or about September 5, 2008, CM's parents retained an advocate to assist them regarding CM's educational needs. (ER 1247). With the help of an advocate, CM's parents requested that the District convene an IEP team meeting to review CM's IEP goals and objectives and progress, and to discuss the parents' request for additional assessments. (ER1425:1-8). CM's parents requested an IEP team meeting and to make an audio recording at the meeting. (ER3251:17-25; 3252:13-24).

**C. <u>CM' Interim IEP Team Meeting September 17, 2008</u>**

On September 17, 2008, nearly three weeks into CM's third-grade, Principal Maddux,

[49]CM's IEP progress reports listed SORT of 1.2 and 80 WPM, level .8. (ER1400).

IST Jones, Speech Pathologist Jane Gebers, CM's teacher, Ms. Bole, School Psychologist Patrick Gargiuolo[50], Advocate Linda Gellar, CM's parents and Dr. Dimitra Loomos were IEP team members. At the meeting, CM's parents signed an assessment plan for a speech language assessment and requested assessments for binocular vision and occupational therapy. (ER1423). CM was about three weeks into the school year. (ER1447:6-1448:9). Before the IEP team meeting, Principal Maddux contacted Administrator Sassone because the parents planned to record the meeting and Ms. Maddux was concerned about an advocate attending the meeting. (ER3252:3-11).

At the meeting CM's parents and advocate asked LES staff about CM's progress and discussed their view that CM's goals needed to be "measurable, because they're not . . . the way they're written." (ER1445:3-1446:4; 1477:19-1479:14; 1487:5-12).[51] LES team members said, LES had recent universal assessment results that could be used to develop measurable, grade-level goals "by the end of next week." (ER1475:3-1476:16;1493:15-18).

Principal Maddux discussed reading interventions available for struggling readers. (ER1451:16-23). IST Jones explained, she did not use a specific curriculum for CM, but used "best practices" by employing a variety of pieces from Lindamood-Bell and other

[50]Mr. Gargiuolo arrived during the meeting while discussions were underway.

[51]Mr. Gargiulo said progress is hard to predict and Principal Maddux opined that "the encouraging news is he didn't move backwards." (ER 1482:1-20; 1483:11-21).

methodologies. (ER1442:16-1443:19;1451:25-1452:10). IST Jones used Lindamood-Bell "strategies" throughout first-grade, but did not know whether her services were consistent with proven Lindamood-Bell programs. (ER1444:17-1445:2). IST Jones used beginning first grade materials to build CM confidence. (ER1476:6-25). CM did not access general curriculum in IST Jones class. (ER1449:22-25).

Dr. Loomos explained "red flags" she found in CM's "school testing from '07" and the relationship of CM's CAPD deficits. (ER1436:12-1438:6). IST Jones and EM discussed CM's improved attention, better listening skills and energy after CM participated in Tomatis therapy at the end of second-grade. (ER1438:7-1439:23). Dr. Loomos explained that CM needed direct intervention and compensatory strategies. (ER1485:3-26).

CM's parents told staff they did not receive IEP progress and asked for copies. (ER1453:4-15; 1454:5-15). The family requested audio books and accommodations to be specified in CM's IEP. (ER1442:4-9; 1464:5-7; 1465:5-7;1423). At the close of the meeting, CM's advocate notified the team that CM's parents disagreed with the LSD's initial evaluation, and sent written notice the same day. (ER1492:6-12; 1419).

The day after the IEP, Dr. Sassone sent electronic mail staff members of CM's IEP team, advising: ". . . They are requesting an IEE. I think we will have to file for due process . . . I will try to negotiate just our re-evaluating . . . ." (ER 1418 ¶5).[52] Dr.

[52]This e-mail was not available during hearing. (ER 622, 590 ¶6).

Sassone further instructed:

> 3. there are no dates of receipt on the private assessments. I need to know when they were received. 4. Pat did not sign report; need all existing copies signed. 7. Eligibility form says Rti documentation is attached but nothing is attached. Pls attach. ... Be sure that all . . . keep you filed in on all communication with the parent and keep copies of everything. (ER 1418).

On Friday, the day after Dr. Sassone's e-mail, Dr. Sassone and LES' IEP team members met and "agreed" that reassessment of CM was warranted. (ER3308:20-3309:20; 3310:20-23). Dr. Sassone drafted the assessment plan, dated September 24, 2008, combining reevaluation LSD proposed and assessments CM's parents requested. (ER3310:10-3311:3; 3313:14-3315:2). Dr. Sassone's sent her letter and assessment plan, proposing reevaluation of CM's academic achievement, social emotional and intellectual functioning. (ER1415; 3312:8-17, 3313:22-25). The additional assessment areas corresponded to areas of disagreement with CM's initial evaluation. (ER1419; 1412 ¶2).

On October 20, 2008, CM's parents obtained a "Pre-test" of CM's academic aptitude and achievement from Lindamood-Bell Learning Processes (LMB). (*see* ER1304-1306[53]). LMB testing yielded, CM's SORT as grade-level 1.6, Spelling grade-level 1.7, oral reading rate 1.4, reading accuracy below first-grade. (ER1305).

On November 18, 2008, CM's parents met with LES and SELPA staff, beginning a series of "facilitated" IEP team meetings. (ER1402-1403; 1404-1408). The meeting agenda concerned CM's present-levels of performance, establishing IEP goals and

---

[53]CM's pretest scores are included in his post-treatment report.

determining appropriate placement and services for CM. (ER1404).

CM's mid-third grade report card said: " He has shown improvement . . . now reads 64 words per minute . . . His writing has also shown progress . . . struggled with math facts . . . ." (ER1280). IEP progress reports listed 1/08 SORT score 2.3, 64 WPM, and "Read naturally" at grade 1.8 approx. 90." (ER1335).

**D. <u>CM's Independent Educational Evaluation</u>**

On December 2, 2008, CM's parents hired Tina Guterman, Ph.D. Neuro-psychologist to conduct a comprehensive evaluation of CM. (ER3828:18-3829:18). In January 2009, Dr. Guterman completed the evaluation. (ER1381-1396). Dr. Guterman concluded that the deficits in CM's phonological processing skills identified in his initial LSD evaluation was a clear marker of dyslexia. (ER1384, ¶1).[54] Dr. Guterman correlated CM's testing by the LSD, Dr. Loomos, Dr. Swain and LMB, explaining CM was severely dyslexic. (ER1385-1387). CM's written language skills were significantly below average. (ER1393). CM's cognitive ability was solidly average to above average. (ER1391). LSD's evaluation significantly understated CM's abilities. (ER1223-1224, ¶¶9-20).

[54]Dr. Guterman identified multiple defects in LSD's initial evaluation, including, exclusive use of retrieval-measures instead of more accurate recognition-measures, scoring errors, defects in test administration and interpretation by the student intern. (ER3662:1-3665:14; 3660:20-3661:24; 3649:2-3652:25: 1590; 1221-1222, ¶¶1-7; 1385 ¶4). IST Jones' omitted sub-tests needed identify CM's individual needs accurately. (ER2053:12:2054:12; 1384 ¶1).

Dr. Guterman testified that CM had needed a research-based, intensive reading remediation program of one-to-one, multi-sensory instruction at a high level of intensity when LES staff evaluated him in 2007. (ER201:23-2011:3). CM's IEP services were insufficient to meet his known needs and the LSD should have known it. (ER2011:10-2013:2; 2015:10-25; 2020:20-2021:10; 2022:17-2023:19).

On March 6, 2009, contracted with Lindamood-Bell Learning Processes and CM began instruction on March 9, 2009. (ER1325-1326). CM received 86 hours of intensive instruction over five weeks in the "Seeing Stars Program." (ER1304).

On March 16, 2009, CM's parents, Dr. Guterman, LES staff and the facilitator met as CM's IEP team for his second annual review and discussed Dr. Guterman's report. (ER1339, 1343, 1346). LSD offered to provide CM with 1-to-1 instruction "to address to-be-developed goals" using Lindamood Bell instructional "strategies" with appropriately trained staff.

Dr. Guterman recommended that CM receive instruction from Lindamood-Bell at its clinic. (ER2026:4-2027:18). Dr. Guterman stated concern that LES' "Lindamood-Bell's strategies,"[55] would differ from clinical Lindamood-Bell significantly or consist of some combination of approaches and that the LMB clinical setting was an important distinction for CM. (*Id.*). Dr. Sassone agreed to clarify the

[55]IST Jones provided LMB "strategies" for CM previously. (ER1444:23-1445:2).

offer after researching "how LMB at the clinic with multiple staff" differed from proposed school-based services and the background of the contemplated teacher. (ER1348 ¶¶3-4).

In April 2009, CM had an emotional crisis and refused to attend school. (ER2987:9-2990:25). CM received psychological therapy, received LMB reading intervention and finished his third-grade year without returning to IST Jones' class. (ER1332.1; 1313-1326). CM's teacher reported "CM has shown such a positive attitude in the classroom this last trimester. . . ." (ER1280).

CM made significant progress in six weeks of Lindamood-Bell instruction, but still required intensive systematic immersion in a multi-sensory remedial reading program. (ER2024:3-25). By the end of third-grade, CM would need 1-2 years of intensive remediation to achieve a basic floor of opportunity and participate in the general curriculum at grade level.(ER2028:2-2029:9).

In August 2010, LSD adopted Dr. Guterman's IEE evaluation of CM's cognitive for CM's triennial review. (ER920, 922-923). However, the LSD continues to reference and use CM's initial evaluation as a valid measure. (ER922, 931, 937).

**E. <u>Administrative Procedural History</u>**

In November 2008, CM requested the CDE to investigate the LSD's failure to timely seek a due process hearing or ensure that CM was provided an IEE, after CM requested an IEE pursuant to 34 C.F.R. §300.502. (ER1242-1264). On December 1,

2008, the CDE notified CM it commenced an investigation.[56] (ER314-316).

On December 3, 2008, the LSD filed a due process complaint in response to CM's request for an IEE. (ER1238-1241). On December 9, 2008, CM's parents requested "complete" educational records for CM, to prepare their response to the LSD's administrative complaint. (ER619-620).

On December 19, 2008, LSD Defendants caused transmittal of a letter to CDE with a copy of the LSD's hearing request for OAH-1, advising CDE, "As the IEE issue is pending . . . it is the position of the District that CDE's investigation should be stayed pursuant to 34 C.F.R. 300.152(c)." (ER1237). On January 30, 2008, the CDE notified CM that it had closed its investigation of the alleged untimely response to CM's IEE request. (ER309).

On February 25, 2009, CM responded to the LSD's complaint, asserting LSD's failure to file a complaint without unnecessary delay, and requesting a determination of unnecessary delay in advance of a full evidentiary hearing. (ER1234-1236). ALJ's denied CM's initial and subsequent request to determine timeliness of the LSD's complaint prior to hearing. (ER302-304, 306, 280, 1229-1233). Three days of administrative hearing took place on April 30, May 1 and May 18, 2009 in OAH-1. (ER256). CM filed a hearing request on April 16, 2009 and a second hearing request

[56]The investigation concerned another issue regarding CM's assessment request at the 9/17/2008 IEP upon which the CDE ordered corrective action. (ER309, 313).

on August 28, 2009. (ER1195, 1184). OAH consolidated the two complaints and an eleven day hearing was completed in OAH-2. (ER139).

## VII. FOUNDATIONAL IDEA LAW

The IDEA guarantees a free appropriate public education (FAPE)[57] tailored to the unique needs of a handicapped child by means of their Individualized Educational Program (IEP). 20 U.S.C. § 1400-1482[58]; *see Bd. of Educ. Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 181-182 (1982). Compliance with the IDEA procedures is "essential to ensuring that every eligible child receives a FAPE, and those procedures which provide for meaningful parent participation are particularly important.'" *N.B v. Hellgate Elementary Sch. Dist.*, 541 F.3d 1202, (9th Cir. 2008), *citing Amanda J. v. Clark County Sch. Dist.*, 267 F.3d 877, 891(9th Cir. 2001). When "highly specific procedural safeguards embodied in §1415 are contrasted with the general and somewhat imprecise substantive admonitions" the importance that Congress attached to IDEA procedures could not be disputed. *Rowley* at 205. Compliance is assured by . . . withholding of federal funds . . . and by the provision for judicial review. *Rowley* at 183-184.

"To guarantee parents the ability to make informed decisions about their child's

---

[57]A FAPE means special education and related services which have been provided at public expense, under public supervision, without charge, meets standards of the State educational agency and provided in conformity with an IEP that meets IDEA requirements in §1414(d). § 1401(9).

[58]All citations by section number refer to 20 U.S.C.A. (West Supp.2012), unless otherwise specified or clear by context.

education, the IDEA grants them the right to 'examine all relevant records' relating to their child's 'identification, evaluation, and educational placement' as well as 'to obtain an independent educational evaluation' of their child if they disagree with what the school district . . . has found." *Amanda J.* at 882., §1415(b)(1)(A).

In 2004, Congress amended the IDEA, emphasizing its intent to improve educational outcomes for handicapped children. 20 U.S.C § 1400(c)(5). Congress found, implementation of the IDEA's purpose was "impeded by low expectations and and insufficient focus on applying replicable research on proven methods of teaching and learning for children with disabilities." §1400(c)(4). Congress mandated strengthening the role of parents and "coordinating [the IDEA] with other . . . school improvement efforts, including the . . . the [ESEA][59] of 1965, in order to ensure that such children benefit from such efforts." §1400(c)(5).

A central IDEA purpose remains, to ensure a FAPE for eligible children, "which emphasizes special education and related services designed to meet their unique needs," and to ensure the rights of handicapped children and their parents are protected. §1400(d); *see also Michael P. v. Dept. of Edu*., 656 F.3d 1057, 1060 (9th Cir. 2011), *quoting Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230 (2009).

[59]In 2002, Congress amended the Elementary and Secondary Education Act (ESEA) with enactment of "No Child Left Behind" (NCLB). 20 U.S.C. §6301 *et. seq.*

The IDEA requires an initial evaluation[60], to determine eligibility and the individual educational needs of the child, and periodic reevaluations, through the IEP team review process, to determine the need and scope for any reevaluation. §1414(b-c), §1414(d). The IDEA requires implementation of an IEP which includes measurable goals, both academic and functional, and IEP team review to address a failure to meet those goals. §1414(d), §1414(c)(1)(B)(iv).

Parental consent is required before an initial evaluation and special education services may commence. §1414(a)(1)(D). Parental "consent" means, "the parent has been fully informed of all information relevant to the activity for which consent is sought." 34 C.F.R. §300.9.

## VIII. THE LSD DEFENDANTS' WITHHOLDING OF CM's RTI DATA VIOLATED THE IDEA PROCEDURALLY & SUBSTANTIVELY

A cornerstone of IDEA procedural safeguards is parents' right to examine "all records relating to [their] child." 20 U.S.C. §1415(b)(1). The IDEA required CM's IEP team, including his parents, to determine CM's eligibility with informed parental consent. 20 U.S.C. §1414(b)(4)(A), §1414(a)(1)(D); Cal. Educ. §56321(c).

The IDEA required LSD Defendants to ensure that, as part of CM's initial IEP team meeting, information obtained from all sources was documented and carefully considered.

[60]"Evaluation [under the IDEA] means procedures used in accordance with §§300.304-300.311 to determine . . . a disability and the nature and extent of the special education and related services that the child needs." 34 C.F.R. §300.15. Evaluation means the same as the term "assessment" in California law.

CFR § 300.306(c). California law also required the IEP team to review CM's RTI assessment or other data to identify CM's specific learning disability, as is discussed below. Cal. Code Regs. 3030(j), *see also* CDE Guide to RTI (ER 473-517).

The district court held, the IDEA only requires disclosure of RTI data if it is used for eligibility determinations. (ER 27:23-28:2; ER32:9-20). Maximum parent participation is not the IDEA, even if RTI data allowed for greater or different participation in developing the IEP. (ER34:2-35:9).

The IDEA does not authorize or permit withholding of CM's material assessment information or for school staff to unilaterally exclude assessment data available to the IEP team to determine existence of a specific learning disability (SLD), or CM's individual needs. 20 U.S.C. §1415(b)(1), 34 C.F.R. §300.311(a)(7). Section 300.311(a)(7) of IDEA regulations required specific documentation of CM's eligibility under the SLD category because CM participated in RTI. 34 C.F.R. §300.311(a)(7). In part, IDEA regulations required documentation of instructional strategies used and student centered data collected, and that [CM's] parents were notified about data that would be collected and strategies for increasing [CM's] rate of learning. 34 C.F.R. §300.311(a)(7), *see also* §300.306(c),[61] §300.309(b)(2).[62]

[61]The IEP team must draw upon information from "a variety of sources, including aptitude and achievement tests." *Id.*

[62]To identify a specific learning disability, the IEP team must consider "Data-based documentation of repeated assessments . . .which was provided to the parents." *Id.*

CM's parents were part of CM's IEP team that determined eligibility and individual needs. LSD's withholding of CM's RTI data violated his rights to IDEA procedural safeguards; *per se* denied meaningful CM's meaningful parent participation and denied CM a FAPE. The IDEA does not limit its RTI documentation requirement based upon the "model" used to identify the SLD.

**A. <u>Determining A Severe Discrepancy Required Corroboration By RTI Data</u>**

Federal IDEA regulations leave to the states the manner for determining whether a child is eligible for special education and related services under the specific learning disability category. *Michael P.* at 1060. California law required LSD to document corroborating RTI or other data that confirmed his "severe discrepancy." Cal. Code Regs. §3030(j).[63] Thus, even using a "discrepancy model," California law required CM's IEP team to consider and document the corroborating data the IEP to his determine eligibility. *Id.*, 34 CFR § 300.306(c)(1)(ii).

CM's IEP did not document any data that CM's IEP team considered except the intern's psycoeducational report and Ms. Jones' academic assessment. (ER1544-1545). CM's IEP documents confirmed his participation in RTI, but only school staff had access to it. (ER1544-1545).[64] Nonetheless, the discrepancy model required IEP team

[63]A SLD is established by comparing standardized test data"when such discrepancy is corroborated by other assessment data." Cal. Code Regs.3030(j)(A).

[64]LSD knew the data was missing and was required. (ER1418, ¶7). Although Dr. Sassone testified that the RTI data referred to SST notes, she had CM's SST notes when she advised staff to provide his RTI data. (*Id.* ¶6; ER3220:2-3221:4).

consideration of CM's RTI data. The district court erred in affirming that the IDEA did not require LSD Defendants to provide RTI data to CM's parents as part of the IEP team.

### B. <u>Section 1414 Required Consideration Of CM's Material RTI Data</u>

Section 1414 of the IDEA required the LSD, while "conducting [CM's] evaluation," to "use a variety of assessment tools and strategies to gather relevant . . . academic information . . . that may assist in determining – (i) whether [CM was] a child with a disability [and] the content of [his IEP]." § 1414(b)(2). CM's RTI data was not identified in LSD's initial evaluation reports or documented during CM's IEP team meeting. Accordingly, CM's initial evaluation did not satisfy § 1414 requirements.

CM's RTI data showed that the type of services the LSD provided since kindergarten did not enable him to meet State grade-level benchmarks in specific skill categories and services his parents obtained were effective. CM's IEP team could not develop an IEP to address his individual needs without reviewing his RTI data.

### C. <u>Withholding Of CM's RTI Data Prevented Meaningful Parent Participation At CM's IEP Team Meetings</u>

Without knowledge and discussion of CM's RTI data and "instructional strategies used," CM's parents could not consider which strategies CM needed to increase his rate of learning. (ER2822:24-2823:7; 1878:6-1880:4). CM's initial IEP listed only CM's "goals" as "Strategies for increasing the child's learning," to satisfy §300.311 of IDEA regulations. (ER1545). CM's goals stated CM would decode words, read high frequency

sight words, read fluently, comprehend, spell words, spell frequently used words, and write clear and coherent sentences words, with 80% accuracy. (ER1524-1526). CM's goals did not identify any instructional strategies for CM to achieve those goals.

LES staff told CM's parents that CM's eligibility was based upon a phonological processing disorder, but did not disclose CM's above benchmark test results in the skill of identifying phonemes correctly. (ER1544, 1617.2). LES staff met three times each school year to discuss CM's RTI data and relied upon it to track CM's academic progress and determine his intervention needs. (ER2995:12-2996:11; 3034:1-3035:14; 2147:15-2150:5; 2152:4-23; 2155:23-2157:14; 2163:6-20; 1452:13-15; 1483:15-21). The IDEA required the LSD to provide and explain the consequences of CM's RTI as part of its initial evaluation; as a condition for meaningful parental participation, and for informed consent to CM's IEPs.[65] § 1414(b)(2),(c).

The partial RTI data obtained after hearing revealed that, prior to CM's second SST meeting and initial evaluation, his DIBELS measures on Nonsense Words and Oral Reading were below benchmark, but his ability to correctly identify phonemes was above benchmark and rated as "established." (ER1617.2-1617.4). CM's parents were entitled to consider this data and to discuss the significance of it in relation to CM's

[65]LSD provided some scores from CM's RTI at his SST meeting. (ER1614, 1619). However, such scores were insufficient to disclose the nature of CM's deficits absent context of measures since kindergarten and knowledge that the scores measured effectiveness of interventions. (ER2809:1-8; 2809:21-2810:4; 470, ¶5).

initial evaluation report. § 1415(b), 34 C.F.R. § 300.311, (ER1551).

At the time of CM's subsequent IEP meetings, RTI data showed that CM progressed from tutoring in the summer between first and second grade, declined after subsequent IST services and his performance jumped when he received Tomatis therapy. (ER453-454). CM's parents did not know.

The district court held "maximum participation is not the standard under the IDEA. The standard is meaningful participation." (ER35:2-9). However, the district court's standard directly conflicts with IDEA's mandate for parent have access to school records and purpose of strengthening the parents' role in decision making. §§1415(b)(1); 1400(c)(5). Thus, the district court erred.

## IX. ALJ ALTERATION OF HEARING ISSUES VIOLATED THE IDEA

A party may amend its notice of due process issues *only* if the other party consents in writing or the hearing office grants permission "not later than 5 days before the hearing occurs." §1415(c)(2)(E). The IDEA does not authorize a hearing officer to alter issues *sua sponte*. The district court held, CM was "put on notice" that the ALJ altered issues in OAH-1,[66] and ALJ-2's decision, that CM's initial evaluation was appropriate, mooted the issue of ALJ-1's alleged error in failing to determine it. (ER17:6-18:5; 15:7-15).

Although the IDEA permits "clarification" of issues, it expressly prohibits altering

[66] The pre-hearing order issue 3 appeared as LSD's complaint issue B. (ER280; 1241). The ALJ addressed a different issue: "The District argues that conditions now warrant new assessments...." (ER266¶38).

issues, consistent with fundamental due process. ALJ-1 added the "equitable reduction" issue after hearing *sua sponte* and failed to resolve the sufficiency of the evaluation, which the IDEA required LSD to prove in hearing. Cal. Educ. §56329(c), (ER4064:23-4066:16).

ALJ-1's addition of the equitable-reduction issue and alteration of LSD's reassessment claim violated the IDEA and fundamental due process. ALJ-1's failure to reach the assessment-sufficiency issue violated §1415(c)(2)(E) and shifted the burden of proof to CM when ALJ-2 undertook the issue. ALJ-2's finding on the sufficiency issue, without notice after its dismissal, violated §1415(c)(2)(E) and equitable principles. The district court erred by failing to so hold.

## X. TEACHER TESTIMONY WAS INADMISSIBLE & INSUFFICIENT TO PROVE LSD PROVIDED IDEA WRITTEN PRIOR NOTICE

The "testimony of a witness concerning a particular matter is inadmissible unless he has personal knowledge of the matter." Cal. Evid. §702, *accord* Fed. R. Evid. 602.[67] Evidence of a person's character cannot be introduced to prove that the person acted in conformity therewith on a certain occasion. Fed. R. Evid. 404(a). Evidence of a person's habit or an organization's routine practice may be admitted to prove that on a particular occasion the person or organization acted in accordance with the habit or routine practice. Fed. R. Evid. §406. The IDEA mandates "written prior notice" whenever a

[67] A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. *Id.*

local educational agency . . . proposes to initiate . . . evaluation . . . ." §1415(b)(3).

IST Jones testified, her usual practice was to provide procedural safeguards when she met with a parent and provided an assessment plan, but she could not recall *meeting with* EM or providing any documents, on the date EM signed CM's initial assessment plan. (ER2594:5-16; 2474:24-2476:21[68]; 2477:7-14[69]). Ms. Jones speculated, based on the date on the assessment plan, she would have met with EM and provided required procedural safeguards and LES did not maintain notice documents. (ER2594:10-2595:14).

The district court held that Ms. Jones' "present recollection" of giving EM IDEA procedural safeguards on February 20, 2007, was unnecessary because Ms. Jones' testimony, that she gave written notice, was admissible under Federal Rule of Evidence 406. (ER27:3-10). CM's mother testified that no meeting occurred and she did not receive procedural safeguards on February 20 , 2007, based upon personal knowledge, but the district court rejected that testimony.[70] (ER27, n.17).

The IDEA requires notice of IDEA procedural safeguards "written in an easily

[68]"Q... do you have any present recollection of sitting down and meeting with [EM] regarding this assessment plan? A. Not at this time." *Id.*

[69]"Q. Do you recall whether you gave her anything else with the assessment plan? A. ... she would have been given a copy of her parent's procedural safeguards. Q. Do you have any present recollection of giving her that document? A. No." *Id.*

[70]EM recalled the event and had checked the original documents she received, which were in her closet. (ER2819:17-2821:8)

understandable manner . . . ." §1414(d). The IDEA's writing requirement precludes proof of compliance through parol evidence. Court's consistently stress the IDEA's written prior notice and limit review to sufficiency of the actual document. *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1526 (9th Cir. 1994)(a formal written IEP requirement "creates a clear record that will do much to eliminate troublesome factual disputes... ."), *see also Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 768 (6th Cir. 2001)(district court erred in affirming ALJ finding that school's capacity to offer appropriate placement supplemented written offer.), *County Sch. Bd. v. Z.P.*, 399 F.3d 298, 306 n.5 (4th Cir. 2005)(ALJ properly focused on what was actually contained in the written IEP when determining appropriateness). The rational that the IDEA mandates written IEP placement offers applies equally to written notice of IDEA procedural safeguards.

Permitting parol evidence to show written notice impermissibly shifts the burden of proof to parents to establish a failure to provide notice and prevents court review of the notice sufficiency, nullifying IDEA's written notice mandate. LSD Defendants' failure to produce or maintain any writing showing it gave notice on February 20, 2007 or the sufficiency of such notice violated the IDEA's written notice requirement. The district court erred by holding FRE 406 permitted parol evidence to prove LSD provided mandatory IDEA notice.

In addition, the district court erred because Ms. Jones' testimony did not constitute "habit" evidence under FRE 406. Ms. Jones did not testify about *other* circumstances to

show habit or custom, much less that circumstances were comparable. Thus, Ms. Jones' testimony did not show "habit" or "routine practice" for herself or LSD.

Ms. Jones' testimony was inadmissible speculation because she lacked personal knowledge and she did not document written prior notice. The inadmissible testimony should have been stricken.[71] Cal. Evid. §702, Fed. R. Evid. 601. The district court erred by finding that LSD Defendants satisfied their burden to prove mandatory notice of IDEA procedural safeguards on February 20, 2007.

## XI. THE DISTRICT COURT ERRED IN AFFIRMING CM'S CLAIMS WERE TIME-BARRED

LSD bore the burden of proof for its statute of limitations defense. Cal. Evid. § 500. The IDEA limitations period did not commence before CM's parents received "a full explanation of the procedural safeguards" and were "fully informed of all information" relevant to CM's assessment and needs identified in his IEP. §1415(b)(3), §1415(d)(2), 34 CFR §300.9(a-b), §1415(f)(3)(D)(ii);Cal. Educ. §56321(a)[72]. CM bore the burden of proof to show the LSD withheld information that the IDEA required it to provide. *Id.*

The district court found that CM's "parents had sufficient knowledge of the educational goings-on inside and outside the classroom to be put on notice for their underlying claims." (ER27:16-18). However, as discussed above, the IDEA required

[71]The ALJ overruled the objection and motion to strike Ms. Jones' non-responsive testimony. (ER2475:19-2476:13).

[72]"A copy of the notice of a parent's ... rights shall be attached to the assessment plan." *Id.*

"written prior notice," to ensure that CM's parents knew they had rights and how to pursue them. § 1415(b)(3) and (c), 34 CFR §300.9. Constructive notice is insufficient to satisfy LSD Defendants' "affirmative duty to transmit a complete explanation the IDEA procedural safeguards." *See El PasoIndependent Sch. Dist. v. R.R.*, 567 Fed.Supp. 2d 918, 943-945 (D. Tex. 2008)(constructive knowledge inadequate when no document proved "direct, actual knowledge" by receiving IDEA procedural safeguards).

LSD Defendants did not produce documents showing CM's parents received notice of IDEA procedural safeguards prior to April 18, 2007, but documented receipt thereafter. (ER1542; 1519-1520; 1490:22-24; 1414 1410.2; 1358; 1282; 1275-1276). LSD failed to satisfy its burden to prove giving mandated notice on February 20, 2007 and sufficiency of the notice. LSD Defendants' failure to prove it provided IDEA procedural safeguards before April 18, 2007, independently prevents accrual of the IDEA's limitations period before that date.

LSD also withheld information required to be provided under the IDEA by failing to provide CM's RTI data, thereby tolling the limitations period. §1415(b)(1). §1415(f)(3)(D). LSD withheld CM's extensive RTI data collected since the beginning of kindergarten. (ER1613 [73]; 1615-1617.5; 1621.1-1621.2; 1624-1624.6, compare 1614-

[73]EM acknowledged receiving ER1613 with CM's assessment plan but did not sign it or receive other documents with it. (ER2819:17-2821:8).

1615; 1618-1619[74]).

LSD's failure to provide mandated notice of procedural safeguards and RTI data deprived CM's parents of material information and tolled accrual of the statute of limitations at least prior to April 18, 2008. Thus, the district court erred in affirming that CM's IDEA claims were time barred based upon the IDEA's two-year limitations period. Facts established by the administrative records prove that LSD Defendants violated the IDEA's "child find" mandate and denied CM a FAPE by failing to evaluate him in kindergarten.

## XII. LSD DEFENDANTS VIOLATED CHILD FIND

The IDEA required the LSD to a "identify, locate and evaluate" CM because he was in need of special education and related services." §1412(a)(3). LSD should have evaluated CM early in kindergarten when, at age six, he performed below kindergarten bench marks and Tier 1 services were insufficient for him to achieve proficiency. 20 U.S.C. § 1412(a)(3). Reading Specialist Harris' testimony and the delay of more that two and a half school years demonstrates that LES staff used its RTI model improperly to delay CM's evaluation based upon its policies that conflicted with LSD Defendants'

[74]SST notes for November 2006 reference "1st-screening" DIBELS-Benchmark, but does not reveal that three kindergarten measures in specific language arts areas were available. SST notes for February 2007 list some scores and "DIBELS-Strategic," but provide no comparisons, CM's DIBELS deficiency areas in Oral Reading Fluency and Nonsense Word Fluency, but "Established" measure for "Correct Phonemes" on his Phoneme Segmentation Fluency test. (ER 1617.1-1617.4).

child find duty. The CDE issued instructions advising that RTI required parent involvement should not be used to delay an IDEA evaluation. (ER497-499). LSD did not follow CDE instructions.

LSD Defendants failed to identify, locate and evaluate CM when he exhibited learning deficits that should have been recognized as dyslexia in kindergarten. Failure to evaluate CM in kindergarten denied him necessary individual special education services and undermined his future progress. CM is entitled to an IDEA remedy of compensatory education and reimbursement for education services his parents funded.

## XIII. <u>CM'S INITIAL EVALUATION DID NOT SATISFY THE IDEA</u>

The district court affirmed ALJ-2's decision that the LSD'S initial evaluation was appropriate, even though the issue had been dismissed as time barred and CM was therefore precluded from presenting relevant evidence on the issue. (ER24:6-25:23; 218:20-219:9; 222:11-223:12). The district court construed CM's claim as mere terminology. (ER37:22-38:1). A primary defect in CM's initial evaluation was its failure to identify CM's unique needs specific to his dyslexia and central auditory processing disorder, regardless of the label. Failure to explain RTI data as part of CM's initial evaluation violated the IDEA.

### A. <u>CM's Initial Evaluation Did Not Identify His Individual Needs</u>

The district court found that the LSD's initial evaluation in 2007 was sufficient because it identified CM's "core problem" as reading and characterized his eligibility as

a phonological processing disorder.[75] (ER24:18-20). Phonological processing or phonological awareness, is a more general label for the subset phonemic awareness.[76] (ER2234:1-14; 1551[77]). Labeling CM's processing impairment as "phonological processing" did not describe CM's deficits accurately or adequately to identify his unique needs related to dyslexia and his auditory integration deficits. (ER2060:15-24; 2736:17-2739:14; 3795:17-3797:17).

Dyslexia constitutes a particular type of SLD. §1401(30);[78] *see also* 34 C.F.R. § 300.8(c)(10). Appropriate IDEA assessment required identifying a "psychological processes" disorder underlying the SLD. Cal.Code Regs. 3030(j);[79] Phonological processing is not listed among recognized psychological processes.

Dr. Guterman explained that phonological processing concerned tasks of

[75]A phonological processing is not defined or classified as a basic psychological process in the California Education Code or the IDEA.

[76]Phonemic awareness is one of the "five pillars of reading." (ER223:12-18). The other pillars are decoding, fluency, comprehension and vocabulary. (*Id.*).

[77]"Phonological awareness refers to a person's ability to detect and access the sound structure of language." (ER1551, ¶2; ).

[78]"A [SLD] means: a disorder in 1 or more of the basic psychological processes involved in understanding or in using language . . .which may . . . include perceptual disabilities, brain injury, minimal brain dysfunction, dyslexia and developmental aphasia." *Id.*

[79]"Basic psychological processes include attention, visual processing, auditory processing, sensory-motor skills, cognitive abilities, including association, conceptualization and expression." Cal. Code Regs. 3030(j)(1).

manipulating letters, sounds and phonemes. (ER2050:12-22). This description did not explain CM's needs related to the inability to do such task.

"Language based learning disability" or dyslexia explained deficits that defined CM's individual needs. (ER1395-1396; 2054:19-2055:11; 2060:15-24). Reading Specialist Harris confirmed that dyslexia is responsive to "certain types of interventions." (ER2213:1-3; 2205:2-2206:19).

LSD should have known CM was dyslexic when it initially assessed CM. (*Id.*; 2065:24-2071:19). LSD's initial evaluation and CM's school performance since kindergarten provided numerous "red flags" showing CM was severely dyslexic, regardless of terminology. (ER2054:19-2055:11; 2056:8-2057:25; 2060:15-24; 2063:12-2064:3; 2065:24-2071:19; 2077:23-2078:3; 2078:13-22; 2079:12-2081:13; 2082:18-2084:24). It did not explain implications of a phonological processing disorder, in the context of RTI data showing his relative strength in decoding phonemes. (ER1617.2).

Dr. Loomos advised CM's IEP team that CM's language deficits were not "a purely phonological awareness problem," but instead were language deficits related to weakness in his ability to integrate auditory, visual and motoric sensory input. (ER1436:12-1438:5). CM's decoding skills concerned phonological processing, but CM's deficits were for integrative tasks that combined auditory, visual and motor functions. (ER3809:1-3810:18). Dr. Loomos' auditory processing evaluation, eight months after CM's initial evaluation, identified CM's "integration" deficits that LSD's initial

evaluation failed to distinguish.

The distinction enabled her to make specific recommendations for CM's needed interventions and accommodations. (ER1533-1534). Dr. Loomos testified that CM needed intensive 1-to-1 therapeutic intervention to address his integration deficits. (ER2741:19-2742:19). IST Jones' understanding that CM had core reading problems caused her to drill decoding skills when CM's needed services to address his integrative deficits. (ER2327:5-2328:23; 2333:22-2334:20; 2338:22-2339:5). IST Jones did not have expertise in dyslexia. (ER2273:24-2274:12).

At the beginning of first-grade, CM should have been able to acquire close to grade level skills with one year of appropriate remediation. (ER2109:1-5).[80] CM did not receive interventions based on applying replicable research on proven methods of teaching and learning for dyslexic children. (ER2294:15-2296:24; 2604:16-2605:16). CM received a combination of strategies for children having difficulty reading, based on persistent repetition. (ER2282:20-2284:14; 2291:13-2293:9). The initial evaluation showed that repetition would not be an effective technique for CM to learn information, but it failed to identify his needs related to either integrative deficits or dyslexia. (ER2119:23-2121:4; 1554, ¶4).

LSD's initial evaluation did not identify CM's individual needs related to dyslexia

[80]IST Jones expected it would take years for CM to reach grade level, if at all. (ER2652:7-2653:9; 2612:6-21).

or his auditory processing disorder accurately or sufficiently. Therefore, it was inappropriate under the IDEA.

**B. LSD's Intern Was Not Qualified To Conduct CM's Initial IDEA Evaluation**

California law mandates, "individually administered tests of intellectual or emotional functioning shall be administered by a credentialed school psychologist. Cal Educ. § 56320(b)(3). Any psychological assessment of pupils shall be conducted in accordance with § 56320 and shall be conducted *by a credentialed school psychologist* . . . ." Cal. Edu. Code § 56324, *emphasis added*. The minimum qualification for an individual to conduct an IDEA evaluation, using individually administered tests of cognitive and emotional functioning is a credential in school psychology. California regulations authorize educational agencies to contract with private *psychologists*, when a credentialed school psychologist is not available to conduct an IDEA evaluation. 5 C.C.R. §3029.[81] California's IDEA regulations do not authorize a school district to use a school psychologist intern to perform assessments or to develop an IEP.

LSD's intern held an Internship Credential issued by the California Commission

[81]". . . School districts . . . shall ensure that credentialed school psychologists are available to perform individually administered tests of intellectual or emotional functioning pursuant to § 56320(b)(3) of the Education Code. (b) Due to the temporary unavailability of a credentialed school psychologist, a school district . . . may contract with qualified personnel . . . (d) The only persons qualified to provide services under this section shall be educational psychologists . . . ." 5 Cal. Code Regs. § 3029.

Teacher Credentialing (CTC) when she evaluated CM.[82] (ER1641). A services credential with a specialization in pupil personnel services, including school psychology, authorizes employment of the holder to perform the pupil personnel services approved on the credential. The legislature did not authorize the CTC to regulate or determine qualifications of individuals who provide specified services under the IDEA. Cal. Educ. §44225. Nor could the CTC, as an executive agency, alter statutes implementing the IDEA. Accordingly, the intern's credential could not *qualify* her to conduct CM's psychological assessments or individually administered tests of intellectual or emotional functioning for IDEA eligibility.

The credential on its face did not qualify the intern to perform duties statutorily assigned to a school psychologist. California specifies IDEA services for "individuals with exceptional needs." Cal. Edu. § 56000. The intern's credential did not authorize any services to be provided for an "individual with exceptional needs." A student intern is not authorized to conduct an evaluation to determine IDEA eligibility or identify individual exceptional needs.

LSD's intern conducted CM's psychological tests and individually administered test of cognitive and emotional functioning independently. LSD's credentialed school

[82] "Commission" means the Commission on Teacher Credentialing. Cal. Edu. § 44001.1.

psychologist, did not observe the intern's test administration to CM.[83] (ER3475:15-17, 3476:16-22). Thus, CM's initial evaluation was not administered by qualified staff and was inappropriate under the IDEA.

**C. <u>LSD's Initial Evaluation Was Defective & Inaccurate</u>**

Dr. Guterman's testimony established that the LSD's initial evaluation results "significantly" understated CM's cognitive ability. (ER1223, ¶¶9-15). The intern's test administration was flawed because she failed to give CM corrective feedback and mis-scored test responses. The form of testing consisted exclusively of free recall measures.[84] (ER1221-1222; 3663:4-3665:14).

CM's impaired retrieval ability, as a feature of dyslexia, prevented accurate measure of his cognitive ability using a form of testing that required free recall. (*Id.*). Dr. Guterman included "recognition" measures and "test the limits" format to elicit CM's significantly higher cognitive measure despite CM's retrieval deficits. (ER3663:4-3665:14; 3674:9-3675:17; 3679:21-25; 3681:20-3682:2;1385, ¶4; 1395, ¶¶2-3). The intern also did not administer a sufficient evaluation of CM's emotional functioning to identify CM's needs. (ER1222, ¶6-7).

The intern administered a "screening" version of the WRAML-2 that was

[83]The school psychologist had not signed the assessment report in September 2008, when he was instructed to change LES' copies. (ER1418, ¶4).

[84]The form of tests using only free recall was not a "form most likely to yield accurate information on what [CM] knows and can do academically." §1414(b)(3)(A)(ii).

insufficient to measure CM's processing deficits in the auditory domain and further assessment of CM's processing was necessary. (ER3976:1-3977:15). LSD's intern concluded that CM's WRAML-2 results were "in the average range." (ER1552). The intern did not evaluate CM's auditory processing, but only phonological processing skills. (ER3495:20-3496:24). Dr. Swain's evaluation showed CM's deficits in processing auditory information impaired his ability to read and spell. (ER3978:15-25).

Undisputed evidence showed that CM's individual needs were not identified until CM obtained assessments from Drs. Loomos, Swain and Guterman. (ER3774:2-11; 3775:7-3777:2).[85] The LSD's initial evaluation did not satisfy §1414(d) requirements and was not appropriate to identify CM's individual needs.

## XIV. <u>CM'S INITIAL IEP DID NOT SATISFY § 1414(d) REQUIREMENTS</u>

An IEP is a written statement that is "developed, reviewed and revised in accordance with [§ 1414 of the IDEA]." §1414(c), §1414(d)(3-4). CM's IEP must include, in part: a statement of "present levels of performance" and how CM's disability affected his involvement and progress in the general education curriculum; a statement of "measurable annual goals," designed to meet his individual needs and to enable him to be involved and make progress in the general education curriculum; a statement of *special education* and related services and supplementary aids and

[85]Dr. Loomos also testified that absent "some sort of physical insult" CM's auditory processing disorder was not different at the time of her testing. (ER3777:3-19; 3779:18-3780:4). There was no evidence CM sustained a physical insult.

services, "*based on peer-reviewed research* to the extent practicable, to be provided;" and, a *statement of program modifications* or supports. 20 U.S.C. § 1414(d).

The district court affirmed CM's initial IEP was sufficient without documenting accommodations because CM's parents participated in development and CM received a curriculum "developed by culling" components from older, more established programs and addressed reading and writing skills. (ER38:2-39:15). The records show CM's IEPs violated the IDEA because none were developed, reviewed or revised in accordance § 1414 and lacked objective goals to measure progress, baselines, accommodations and services.

CM's IEP did not include present levels of performance to allow measurement of CM's progress in the general curriculum, aligned with challenging State academic standards so that students, teachers, parents and administrators could measure CM's progress against common expectations for academic achievement. 20 U.S.C. 6301.

The district court held that the IDEA does not require CM's IEP to identify a relationship between State achievement standards and CM's academic progress because the IDEA did not incorporate NCLB standards. (ER29:18-30:14). However, in 2004 Congress coordination with NCLB, including accurate measure of student progress against State standards, and imposed new requirements for higher expectations and services based on "replicable research on proven methods of teaching and learning for children with disabilities." §1400(c)(4-5).

CM's IEPs were not designed to enable him to make adequate yearly progress because low expectations formed the basis of his IEP and services. *See Florence County Sch. Dist. v. Carter*, 510 U.S. 7, 10 (1993)(affirming parents' reimbursement when lower court found IEP goals of four months progress for the entire school year "were wholly inadequate."). Nor did CM's IEP provide goals and objectives that allowed objective measurement of CM's progress by any standard. (ER1524-1526). CM's IEP provided narrative descriptions of his "present levels of performance, relationship to core curriculum and needs identified related to the goal(s)," with the following:

> [CM] is able to identify letters of the alphabet and their sounds. He has difficulty decoding words as he reverses 'b' and 'd' and incorrectly identifies sounds in word. ... When decoding he is being taught to look through to the end of the word saying each sound . . . [CM's] reading . . . is not fluent due to difficulties with decoding . . . During oral discussion [CM's] knowledge and comprehension are good but when struggling to read comprehension suffers.

(ER1544). CM's annual goals were to decode and read words and read fluently. (*Id.*)

CM's IEP does not provide an objective target to measure his progress in the general education curriculum or otherwise. The IEP was not appropriate under §1414(d).

## XV. CM'S MARCH 2008 IEP DID NOT SATISFY § 1414(d)

The IDEA required review of CM's IEP to ensure that evaluate CM's IEP team reviewed CM's IEP and revise it to address "information about [CM] provided . . .by [his] parents." §1414(d)(4); Cal. Edu. §56341(a-c).[86] When EM provided information

[86] Each meeting to ... review, or revise an [IEP] ... shall be conducted by an [IEP] team ... The [IEP] team shall include ... (5) an individual who can interpret the

about CM's assessments with Dr. Loomos and Dr. Swain, LSD had the obligation to evaluate his unmet needs related to CAPD. *N.B. v. Hellgate Elem. Sch. Dist.*, 541 F.3d 1202, 1209-1210 (9th Cir. 2008)(school district has an independent duty to evaluate a child when it has noticed that the child may have a learning disability).

The district court held CM's March 2008 IEP team included necessary members and LSD was not required to document an informal meeting in May. (ER40:4-16). Further, the IEP satisfied §1414(d). (ER40:19-20).

LSD received notice of CAPD diagnosis and information from EM about Drs. Loomos.[87] CM's IEP team met in March 2008 to "review progress & determine [CM's] needs," and no school-psychologist, speech language pathologist or reading specialist attended. (ER1523,1519). The LSD did not document discussions of CM's CAPD diagnosis or of RTI data gathered since CM's initial IEP. (ER1519-1521). LSD violated IDEA requirements for CM's IEP. *See e.g., Hellgate* at 795(parents' failure to secure private school staff attendance did not negate school district's obligation to convene IEP with necessary members).

Like CM's initial IEP, CM's March 2008 IEP did not include present levels of

---

implications of assessment results . . . (c) ... for an individual suspected of having an [SLD], at least one member ... shall be qualified to conduct individual diagnostic examinations ...." Cal. Edu. § 56341(a-c).

[87]LES staff had received Dr. Loomos' report and discussed Dr. Swain's recommendations provided to EM by February 28, 2008, prior to the IEP team meeting. (ER1527;2849:7-2850:3).

performance that enabled measurement of CM's progress objectively or against State standards, regardless of CM level achieved. (ER1335-1338), §1414(d), §6301. Nor did CM's IEP document accommodations, despite Dr. Loomos' recommendations. (ER1521). Testimony that teachers provided appropriate accommodations without IEP notation is insufficient under the IDEA and inconsistence with the evidence.

LSD's failure to convene and document an IEP team with necessary members prevented CM's parents' meaningful participation in IEP team decisions. LSD again failed to provide adequate RTI data and prevented informed parental consent to CM's IEP. (ER1541, 1537-1538, 1528). CM lost the educational benefit of appropriate services. LSD denied CM a FAPE.

### A. <u>LSD Prevented Meaningful Parent Participation By Failing to Document Meeting As An IEP Team</u>

The district court affirmed the ALJ's finding that a meeting with LES staff and CM's parent was not an IEP team meeting that violated the IDEA. (ER41:11-42:4). The IDEA required LSD to convene an IEP team meeting after EM's request to have an IEP team meeting to discuss CM's progress and needs. §1414(d)(4), (ER1498).

On May 20, 2008, CM's IEP team discussed changes to CM's IEP that EM requested and CM's need for further assessment, which either constituted an undocumented IEP meeting or LSD did not convene a meeting as EM requested, as LSD did not document any meeting in response to EM's request. (*Id.*).

In September, 2008, CM's IEP team disagreed about whether a speech language assessment was offered at the May meeting because LSD did not document any discussions. (ER1433:14-1434:18). CM's speech language assessment should have been completed by that time. Cal. Educ. §56321. LSD also violated IDEA requirements by failing to either timely conduct the evaluation or provide written prior notice of its refusal in May and prevented an earlier IEE request.

CM's parents requested CM's interim IEP team meeting of September 17, 2008, to address concerns about unresolved IEP defects. CM's parents did not know whether CM was making meaningful progress in relation to his grade or age level benchmarks. RTI data would have clarified this. (ER1477:1-1479:19; 1482:1-20). CM's parents invited Dr. Loomos to explain her findings again. LES staff maintained that CM was making appropriate progress in relation to his low cognitive ability shown by the intern's report. (ER1473:3-1474:7; 1482:9-16). CM's parents requested an IEE that could have been requested in second grade, if LSD convened an IEP meeting.

**B. <u>CM's Interim IEPs Did Not Offer CM A FAPE</u>**

In January 2009, the LSD revised CM's IEP, offering CM longer periods in IST Jones' class and goals to reach first and second-grade reading and writing targets by November of fourth-grade. (ER1353-1356). CM's parents did not agree and requested additional goals to address CM's auditory processing, focus and attention. (ER1351). The IEP offer was based upon low expectations and offered random services. It did not

offer the immersion in a Lindamood-Bell program that Dr. Guterman advised as proven effective for dyslexic students. CM's interim IEP did not offer a FAPE.

## XVI. CM'S SECOND ANNUAL REVIEW IEP DID NOT OFFER CM A FAPE

The district court affirmed the ALJ's finding that CM's March 2009 offered CM a FAPE by proposing 1-to-1 Lindamood-Bell "strategies[88] to be used systematically by appropriately trained staff," 2 hours per day, five days per week. (ER46:15-47:23).

However, the offer occurred after CM had started the Lindamood-Bell Processes program his parent had contracted for. (ER1325-1326). The program was not sufficiently identified in offer because it was not in existence[89]; the LSD had not confirmed its ability to adequately replicate a Lindamood-Bell program; and, the "to be determined" goals for delivering services were not developed until June 2009. (ER1343, 1348). Dr. Guterman stated concerns at the IEP meeting that LSD services did not replicate LMB. (ER1343).[90]

LSD's offer of services based on LMB "strategies," which could not be to clinical Lindamood-Bell services, after CM's parents contracted, paid for and commenced LMB, did not constitute an valid offer of services. Thus, the district court erred.

---

[88]IST Jones asserted that she provided CM with services based upon Lindamood-Bell "strategies" but did not know how LMB programs differed and was qualified by only three days of training. (1444:13-1445:2; 2275:20-2277:23).

[89]Dr. Sassone was still "Researching how LMB at the clinic...differs." (ER1348).

[90]The CDE confirms, "it is important to ensure intervention fidelity," fidelity monitoring "observations that are components of the intervention. (ER501).

## XVII. CM IS ENTITLED TO REIMBURSEMENT FOR APPROPRIATE PARENT FUNDED ASSESSMENTS AND EDUCATIONAL SERVICES

The district court affirmed that CM was not entitled to reimbursement for private services and assessments his parents funded because it affirmed that the LSD did not deny CM a FAPE. (ER47:24-48:9). The record refutes the district court's conclusion.

CM received five-weeks of intensive Lindamood-Bell services after an evaluation of his needs. Post-treatment testing demonstrated that CM made significant gains. (ER1304-1306). By summer following third-grade, CM was able to read 88% of third-grade materials and 67% of fifth-grade materials. (ER1305). CM's SORT score was grade 3.4 and his "Word Attack," Reading Rate, Accuracy, Fluency and Comprehension improved by a minimum of one grade level.

CM also made significant gains following Tomatis therapy[91], as the jump his increase on RTI showed. LSD denied CM a FAPE. CM is entitled to reimbursement as a equitable remedy and compensatory education services to reach the level he would have achieved with appropriate remediation that Dr. Guterman and Dr. Loomos recommended.

## XVIII. THE DISTRICT COURT ERRED IN DISMISSING CM's § 504 RETALIATION CLAIM REGARDING FACILITATED IEP MEETINGS

It is the intent of the California legislature that IEP team meetings be non-adversarial and convened solely for the purpose of making educational decisions for the good of the

[91]The ALJ found Tomatis was "highly controversial," without explanation. However, its effectiveness is supported by peer-reviewed research the IDEA requires. (ER1625-1640).

individual with exceptional needs. Cal. Educ. § 56341.1(h). IEP teams may include individuals invited by a parent or district who have "knowledge or special expertise about the child." § 1414(d)(1)(B)(vi). The IDEA does not authorize a district to invite its "facilitator," particularly to advocate LSD's position and misstate law. (ER1402,¶2).

The district court dismissed CM's claims that LSD Defendants used the facilitated IEP process coercively in retaliation for CM's IEE request. (ER70:2371:2). Subsequent IDEA case law confirmed that CM was not required to exhaust his § 504 claims. Exhaustion is not required for CM's claim that IEP team meetings facilitated by LSD's advocate constituted unlawful retaliation under §504 of the Rehabilitation Act. *Payne v. Penninsula Sch. Dist.*, 653 F.3d 863, 871(9th Cir.2011)(IDEA's exhaustion provision applies only in cases where the relief sought is available under the IDEA).

CM alleged that LSD used facilitated IEPs in retaliation for his IEE request and used them coercively. (ER740, ¶61; 762, ¶226). CM's allegations were sufficient to support inferences of adverse action and injury, as facilitated meetings continued as a means elicit and manipulate facts affecting administrative hearings and court review.

Educational services available through the IDEA's administrative process could not remedy the effect of facilitated IEP team meetings. (ER1418; 1402, ¶2; 1403). However, remedies are available under §504. The district court erred when it dismissed CM retaliation claim, which cannot be addressed administratively. The allegations were sufficient to warrant relief under §504, and any non-administrative relief under IDEA.

## XIX. CM's CLAIMS OF ERROR WERE NOT MOOT OR WERE EXCEPTED

Federal court jurisdiction depends on the existence of a "case or controversy" under Article III of the Constitution. *See PUC v. FERC*, 100 F.3d 1451, 1458 (9th Cir. 1996), (ER12:2-9). A claim is moot if it has lost its character as a present, live controversy, and no effective relief can be granted. *See Flast v. Cohen*, 392U.S. 83, 95 (1968), *citing California v. San Pablo & T.R. Co.*, 149 U.S. 308 (1893) . "Where the question sought to be adjudicated has been mooted . . . no justiciable controversy is presented." *Id.*[92]

Based upon want of Article III jurisdiction, the district court held that two primary claims of error in OAH-1 were moot. (ER12:2-14:19). The error of ALJ-1's equitable reduction CM's IEE reimbursement became moot when LSD Defendants voluntarily paid the amount of the reduction just before summary judgment motions, in September 2011. (ER12:20-23; 915, ¶5, 917-918). Alleged error, by authorizing the LSD's reevaluation pursuant to an administrator's assessment plan,[93] was moot after the LSD conducted CM's triennial reevaluation based upon consent to a different assessment plan developed through prescribed IDEA procedures. (ER12:16-20; 908:20-28; 912-913; 915:22-916:1). The court held, CM's claim for attorney fees as prevailing party: (1) was ancillary to mooted issues;

[92]The *Flast* Court addressed the "standing" and does not support a proposition that federal court jurisdiction is lacking if part of an issue becomes moot. The *California* holding similarly concerned federal jurisdiction after dismissal of the case.

[93]CM alleged that the administrator's plan was retaliatory and violated the IDEA. (ER1018,¶112). Evidence showed the reassessment plan was part of the effort to "negotiate" an alternative to CM's IEE request. (ER1418, ¶5; 1414-15; 1402, ¶2).

(2) did not implicate collateral legal consequences necessary to avoid mootness; and, (3) the moot issues were not capable of repetition yet evade review. (ER13:4-14:4).[94]

**A. <u>CM's Claims Brought Pursuant To § 1415(i)(2) Presented A Live Controversy</u>**

The determination of whether a "claim" is mooted by subsequent events, necessarily depends upon the basis of the district court's jurisdiction over it and availability of relief. The IDEA provides multiple bases for federal court jurisdiction here. The IDEA grants federal court jurisdiction to review a final administrative decision. 20 U.S.C. §1415(i)(2). Separately, the IDEA grants federal court jurisdiction to determine reasonable attorney fees for a prevailing parent in any action brought under § 1415.[95] 20 U.S.C. §1415(i)(3)(B).

The IDEA's § 1415(i)(2) conferred federal court jurisdiction for CM to dispute the ALJ's decision in OAH-1 because CM was aggrieved by the final decision on the LSD's administrative complaint.[96] 20 U.S.C. § 1415(i)(2). The question to be adjudicated was whether the ALJ erred by his decision in OAH-1 as alleged. (ER994-995, ¶4). CM's federal court remedies included "full reimbursement" for his IEE, declaratory relief,

---

[94]CM's OAH-1 claim, that his initial evaluation violated the IDEA, may also be considered moot because the ALJ had decided the dismissed claim against CM in OAH-2/OAH-3. (ER18:23-24). CM contends the sufficiency of the initial evaluation was not moot based upon the same reasoning set forth below, but discusses the district court's holding as part of alleged error. (ER18:23-24, 25:21-22).

[95]The IDEA also provides jurisdiction to award attorney fees to a prevailing State educational agency (SEA) under specific conditions. §1415(i)(3)(B)(II). However, the IDEA does not authorize independent jurisdiction for a SEA to dispute a parent's prevailing party status.

[96]The district court also had jurisdiction over CM's Rehabilitation Act claims.

including specific findings, other relief deemed just and proper. (ER1023-1024, ¶¶2-9).

The district court held Article III jurisdiction because it did provide additional reimbursement, declaring CM's right to an IEE "at no cost to the parent."[97] (ER16:11-17:3). The court could provide declaratory relief, holding ALJ-1 erred by equitably reducing IEE reimbursement, required to be at not cost to the parent, and that equity did not support reduction. CM's reimbursement issue was not moot.

ALJ-1's erroneous authorization to reevaluate CM pursuant to an assessment plan that violated the IDEA also continued to present a live controversy. CM's triennial reevaluation was not the same reevaluation[98] and LSD Defendants' abandonment of efforts to impose it did not moot CM' s claims that such conduct violated §504 and IDEA. (ER96:13-24; 1018-1020, ¶¶111-121). *PUC v. FERC*, 100 F.3d 1451,1460 (9th Cir. 1996)(voluntary cessation of allegedly illegal conduct does not make the case moot).

The district court could provide an IDEA remedy by declaring ALJ-1 erred as alleged; CM should have prevailed, entitling him to reasonable attorney fees and costs; and, it can remedy CM's retaliation claims. (ER1018, ¶¶108-109, 1022-1025, ¶¶1-17). Accordingly, CM's claim that ALJ-1 erred by authorizing reevaluation were not moot. Further, CM's claims were not moot because of collateral consequences and are capable

---

[97]The district court granted declaratory and equitable relief on CM's claim for CM additional reimbursement of $800 for the IEE. (ER16:4-17:3, ER1022, ¶1).

[98]The district court's cited a Pennsylvania district court case where the "District ... performed *this* evaluation," rendering defendant's issue moot. (ER12:17-20). This case is distinguished by a different evaluation and unlawful retaliation.(ER96:14-18).

of repetition yet evade review.

## B. Collateral Consequences Prevented CM's Claims From Being Moot

The IDEA authorizes federal court jurisdiction to review ALJ error in determining prevailing party status and independently to determine reasonable attorney fees and costs. § 1415(i)(2-3), Cal. Educ. §56507(b)&(d). CM's loss of full attorney fees as prevailing party distinguishes his claim from "ancillary" attorney fees potentially recoverable under *Cammermeyer v. Perry*, 97 F.3d 1235, 1238 (9th Cir. 1996), (ER13:4-14:4).

"Ancillary" attorney fees are distinguished from CM's right to prevailing-party attorney fees claim because the former arose in the trial court and survived despite dismissal of the moot case. *Cammermeyer v. Perry*, 97 F.3d 1235 (9th Cir. 1996)(plaintiff's attorney fees claim arose in district court action "ancillary" to underlying mooted discrimination claim); *Dept. of Edu., State of Hawaii v. Rodarte*, 127 F.Supp. 2d 1103, 1114 (D. Haw. 2000)(*Cammermeyer* held attorneys' fees claim was "ancillary" and would survive independently, accordingly did not create collateral consequences); *accord S-1 v. Spangler*, 832 F.2d 294, 297 & n.1 (4th Cir. 1987)("ancillary" attorney fees survived mooting of § 1983 action); *U.S. v. Ford*, 650 F.2d 1141, 1144 (9th Cir. 1981)(defendant's appeal of order denying motion to intervene mooted after court dismissed plaintiff-IRS's case; attorney fees claim was ancillary).

CM's §1415(i)(3) right to attorney fees was not "ancillary" because it did not survive mooting of his claims. CM's right to recover prevailing-party attorney fees

and costs constituted collateral consequences.

The district court cited *Rodarte* to hold that collateral legal consequences did not bar its finding CM's claims moot. (ER13:17-26). *Rodarte* is distinguished on its facts and law. However, the analysis is consistent with holding that collateral consequences precluded finding CM's claims moot. *Rodarte* at 1113-1114.; *see also White v. White*, 925 F.2d 287, 290 (9th Cir. 1991)(potential adverse consequences prevent alleged administrative error by parol board from being mooted).

In *Rodarte*, the court addressed the challenge by defendant, Hawaii Department of Education's (DOE), pursuant to § 1415(i)(2), alleging the ALJ erred by awarding *parent* some compensatory education. *Rodarte* at 1111-1112. The district court dismissed defendant-DOE's case because the student received the disputed compensatory education and graduated from school, holding DOE could not maintain an action to dispute the parent's prevailing party status under IDEA. *Id.* at 1112.

In *Rodarte*, the IDEA did not provide federal jurisdiction for the educational agency to independently dispute the parent's prevailing party status under §1415(i)(3). The federal court lacked jurisdiction over defendant-DOE's challenge under §1415(i)(2). Conversely, the IDEA provides federal jurisdiction to declare a parent's right to recover reasonable attorney fees as prevailing party. § 1415(i)(3). Therefore, collateral consequences preclude an ALJ's alleged error from being moot when a parent seeks prevailing party attorney fees pursuant to §1415(i)(3).

The collateral consequences of mooting CM's IEE reimbursement and reevaluation claims were forfeiture his § 1415(i)(3) claim to prevailing-party attorney in OAH-1 and the district court. (ER83:8-84:4, 99:9-97:5, 99:23-25). Based upon issues being mooted, the court reduced fees for limited success and punitively for continuing to seek relief on mooted issues. (*Id.*) The collateral consequence was unjust, chills parents' IDEA rights and bars finding CM's claims moot.

Additional collateral consequences prevent finding CM's claims moot. For example, the ALJ determined that CM's parents inequitably delayed their IEE request and refused a reevaluation as a strategy warranting reduction of IEE reimbursement under the IDEA. (ER264-265, ¶¶30-35). CM's parents are tainted by the ALJ's erroneous findings which can prejudice them in any future IDEA disputes. The LSD continues to cite CM's initial evaluation as a valid measure of his ability and progress. (ER922[99]; 924, 937). OAH-1 remains as authority to be used against CM and other parents. *See Lafayette Sch. Dist.*, 109 LRP 39519 (2009).

Moreover, finding CM's reevaluation claim moot bars his §504 retaliation claims by preventing a judicial determination that the administrator's assessment plan violated the IDEA and was retaliatory. (ER380). Thus, collateral consequences preclude CM's claims that ALJ-1 erred from being moot.

[99]"Previous Evaluations . . .Please see report for specific information." *Id.*

## C. If Moot, CM's IEE Reimbursement & Reassessment Claims Are Excepted As Capable of Repetition Yet Evading Review

The Ninth Circuit applies a two part test to determine whether an otherwise moot claim is excepted as capable of repetition yet evades review. *Wiggins v. Rushen*, 760 F.2d 1009, 1011 (9th Cir. 1985). The two prongs are: (1) Whether the challenged action is of limited duration, and, (2) whether there is a reasonable expectation that the complaining party will be subjected to the same action again.

The district court found the exception did not apply because CM did not suggest that his parents might fail to disagree with any assessments for seventeen months. (ER14:11-16). However, an ALJ might as easily find an equitable reduction was appropriate after twelve months. (ER272:, ¶13). CM is likely to miss the unspecified time limit for many recurring reasons. For example, six months of the seventeen month interval were summer vacation periods and LSD's conduct prevented an earlier IEE request. (ER1546; 1498[100]). CM's IEP team review still occurs shortly before summer and issues remain unresolved as further IEP review continues. CM's parents also continue to cooperated with staff to mitigate effects of erroneous test results, but did not have complete information. (ER 909, ¶¶3-5; 470; 1498, 1500-1501, 1527; 1482:1-1483:21; 3814:15-3816:17; 3824:19-3825:3; 3834:13-3835:13). Further, LSD Defendants are likely to employ similar delaying tactics and seek reevaluation to discourage making an IEE

[100]"As we are approaching the end of the school year I wanted to do a team meeting/IEP to discuss a few subjects ...." *Id.*

request because it can moot such claims at will. CM's claims are capable of repetition.

The statutory period for challenging LSD's evaluation is two years and reassessment is required every third year unless the parties agree otherwise. § 1414(a)(2)(ii). The time for a three-year reevaluation likely would occur before the dispute can be resolved in a civil action because IEP meetings can continue throughout a school year.

CM's 2010 assessment was completed in August 2010, and revised in April 2011, as his parents again attempt to resolve issues with the assessment. (ER920). CM's parents again obtained testing by Dr. Guterman to clarify CM's needs after the LSD failed to administer GORT-IV test as prescribed in CM's assessment plan. (ER921, 612). If CM's parents disagree with CM's triennial assessment, the LSD can seek reevaluation to moot CM's IEE disagreement with his triennial. CM's claims evade review and are excepted from being.

## XX. ALJ-1 ERRED BY REDUCING CM'S IEE REIMBURSEMENT & AUTHORIZING THE LSD'S REEVALUATION

A parent has the right to an IEE at public expense "if the parent disagrees with an assessment obtained by the public education agency." Cal. Educ. §56329(b), 34C.F.R.§300.502(b). The ALJ erred in ordering an equitable reduction because CM's right to an IEE entitled him to it an no expense to his parents. 34 C.F.R. 300.502(a)(3)(ii), (ER272, ¶13). CM's parents' delay was not prejudicial or inequitable. LSD Defendants' unclean hands, by withholding CM's RTI data, also preclude equitable

relief, even if were available.

The ALJ also erred in authorizing the LSD's reassessment. The IDEA expressly requires an IEP team determination that reassessment is needed and the data needed from reassessment. §1414(c).

Contrary to IDEA procedures, LSD sought to reevaluate CM in response to his parents IEE request, even though cognitive testing "recent enough to be valid" and universal assessments were adequate to revise CM's IEP goals. (ER 1418 ¶5, 1414, 1410.1,¶2; 1922:23-1923:9; 1474:17-1475:5; 1487:5-16). LSD's Administrator, bypassed the IEP process and developed the September 24, 2008 assessment plan to "negotiate" the LSD's reevaluation, knowing reevaluation would prevent CM from disagreeing with CM's initial evaluation and delay obtaining an IEE. ALJ-1 erred by holding the IDEA authorized LSD to reevaluate CM under the administrator's assessment plan.

## XXI. THE DISTRICT COURT ERRED IN ENTERING JUDGMENT ON CM'S §504 RETALIATION CLAIMS

The right to an IEE is conditioned upon the parents' disagreement with an evaluation by the LSD. 34C.F.R.§300.502(b). If the LSD could conduct an intervening assessment of CM, CM's parents would be required to dispute the substitute evaluation. The record supports CM's claim that LSD Defendants' reevaluation effort was retaliatory and violated the IDEA. The district court did not resolve or address the retaliation claim.

Discovery was still pending on CM's retaliation claims. Nonetheless, CM has stated claims against the LSD Defendants regarding their reevaluation effort. The district court erred in entering judgment while CM's retaliation claim was pending.

## XXII. THE DISTRICT COURT ERRED IN DISMISSING, PURSUANT TO RULE 12(b), CM'S IDEA CLAIMS AGAINST THE CDE DEFENDANTS

CDE Defendants have a statutory duty to protect the rights of children with disabilities and their parents to IDEA procedural safeguards. Section 1412 required CDE to have "in effect policies and procedures to ensure . . . Children with disabilities and their parents are afforded [IDEA] procedural safeguards." §1412(a)(6,11). Section 1415(a) also requires the CDE to establish and maintain policies and procedures to ensure CM's rights to IDEA procedural safeguards. § 1415(a).

IDEA regulations require each state educational agency (SEA) to established a complaint resolution procedure (CRP) that includes written procedures for "resolving any complaint" regarding the education of a child with a disability. 34 C.F.R. §300.151.[101] CRP regulations are intended to "allow [parents and school districts] to resolve differences without resort to more costly and litigious resolution through due process. . . ." *Porter v. Bd. Trustees, Manhattan Beach Unif. Sch. Dist.*, 307 F.3d 1064, 1072 (9th Cir. 2002). CRP is "critical to each State's . . . general supervision

[101]The corresponding 1999 IDEA regulations were located at 34 C.F.R. §§ 300.660-300.662 until relocation as §§300.151-300.153 amended, effective August 2006.

responsibilities" under § 1412. *Porter* at 172. CRP regulations required resolution of CM's complaint within 60 days. 34 C.F.R. § 300.152,[102] *see also* Cal. Edu. § 56100(j), 5 C.C.R. §4650(a)(7)(B).

The district court held CM could not state a claim against CDE Defendants for closure of CDE's investigation. (ER131:18-132:24). CM's first amended complaint and the administrative records demonstrate CM could state a claim against CDE Defendants based upon a private right for breach of CDE's §1412 and §1415(a) duties.[103] (ER1138-1141 ¶¶60-73; 1150-51 ¶¶129-135; 1137-38 ¶¶54-58; 1148-50, ¶¶118-128). CM pled and the CDE's notice confirms that CDE closed its investigation "without question" and violated the IDEA's mandate. (ER 314-316; 1148-1149, ¶¶118-123).

## XXIII. CM CAN STATE AN IDEA CLAIM AGAINST CDE DEFENDANTS FOR FAILURE TO CONDUCT OVERSIGHT BY INVESTIGATING CM'S COMPLIANCE COMPLAINT

The IDEA authorizes remedies against a state agency for violations of IDEA, both at law and in equity "to the same extent as those remedies are available . . . against any public entity other than a State." §1403(b). Remedies for intentional violations of the Rehabilitation Act anti-discrimination provisions similarly authorize "all equitable relief

---

[102] "Each SEA must include in its complaint procedure a time limit of 60 days after a complaint is filed under § 300.153 . . . ." 34 C.F.R. §300.152 (formerly §300.661).

[103] The district court similarly dismissed CM's §1415(a) claim against LSD Defendants, which here forms the basis of CM's appeal claim that the IDEA provides a separate remedy for LSD Defendants' alleged retaliation. (ER114:11-18).

as the court deems appropriate" and reasonable attorney's fees. 42 U.S.C.A. 2000e-5(g), 29 U.S. C. § 794(a)(b). The existence of a statutory right implies the existence of all necessary and appropriate remedies. *Franklin v. Gwinnett County Pub. Sch.*, 503 U.S. 60, 68 (1992), *quoting Sullivan v. Little Hunting Park Inc.*, 396 U.S. 229, 239 (1969).

The district court dismissed CM claim finding, the issue of whether the LSD engaged in unnecessary delay "was expressly rased and decided in plaintiffs' favor, the issue was included in the LSD's due process case and properly set aside by the CDE. (ER132:17–22). However, LSD's alleged unnecessary delay was an affirmative defense CM raised nearly a month after the CDE closed its investigation. (ER1234; 307, 309). The district court's holding was error.

Section 300.152 did not authorize CDE to set aside its pending investigation and the IDEA required CDE Defendants to establish policies and procedures ensuring that issues raised in CM compliance complaint were properly set-aside. Further, even if §300.152 did authorize a subsequent set-aside, the regulation did not authorize CDE to close its investigation without addressing corrective action. 34 C.F.R. §300.149, 300.600(a)(2),(e).

The IDEA provides CM a private right of action under the Supreme Court's four-part test. *Cannon v. University of Chicago*, 441 U.S. 677, 688 n.9 (1979). CM's claims clearly meet part one and three of the *Cort* factors because CM is one of the class protected by the IDEA and implying a remedy is consistent with the IDEA's underlying purpose to protect rights to IDEA procedural safeguards. Section 1403(b) of the IDEA satisfies part

two by demonstrating Congress' intent to provide a remedy. CM's claim satisfies part four because an IDEA remedy does not encroach upon a cause of action relegated to State law. Although the issue is a case of first impression, the IDEA provides CM a private right of action against CDE Defendants.

## XXIV. CM STATED OR COULD STATE AN IDEA CLAIM AGAINST CDE DEFENDANTS FOR SYSTEMIC DENIALS OF PROCEDURAL SAFEGUARDS IN ADMINISTRATIVE HEARINGS

CDE has a statutory duty to ensure that IDEA procedural safeguards and a FAPE are provided through its oversight and having adequate policies and procedures in effect. § 1412(a)(6). CM stated or could state a claim against CDE Defendants under §1412. This case illustrates the resulting morass that begins with a denial of IDEA procedural safeguards that require written notice of the hearing issues.

The OAH employs a routine practice regarding clarification of hearing issues that significantly alters the issues set forth in the administrative complaint. (e.g, ER200:22-202:11, 235:20-249, 199-1200). CM objected to the ALJ's alteration of his issues and was overruled. (ER1180-1183; 187-188). OAH's practice of altering hearing issues through prehearing conferences and adding issues *sua sponte* undermines the IDEA procedural safeguards necessary for a just administrative process. CDE oversight does not require oversight of individual ALJ or cases but requires "policies and procedures" to ensure fundamental fairness.

The process by which ALJ-2 determined CM's initial evaluation was appropriate

violated IDEA procedural safeguards and CDE monitoring procedures should ensure that such errors are not perpetuated. ALJ-1's alteration of issues and failure to determine the sufficiency of his initial evaluation deviated from standard legal practice, shifted the burden of proof and nullified IDEA procedural safeguards. OAH also employs a prehearing conference process that systematically bars witness testimony when disclosure is timely under the IDEA. (ER1666:14-21; 1667:11-13; 1671:7-19).

The district court erred by dismissing CM's claim against CDE Defendants for breach of their duty to ensure IDEA procedural safeguards and fundamental fairness in OAH hearings. Alternatively, CM should have been granted leave to amend his complaint.

## XXV. THE DISTRICT COURT ERRED IN DENYING FULL ATTORNEY FEES TO CM AS PREVAILING PARTY IN OAH-1

Once a party is considered a prevailing party, the court's discretion to deny fees is narrow and attorney fees generally must be awarded unless *special circumstances* render such award unjust. *Thomas v. City of Tacoma*, 410 F.3d 644, 649 (9th Cir. 2005), *citing Hensley* at 429; *Abu-Sahyun v. Palo Alto Unified Sch. Dist*, 843 F.2d 1250, 1252 (9th Cir. 1988). Whether special circumstances render an award unjust is based upon two factors: (1) whether allowing attorney fees would further the purposes of the statute; and, (2) whether the balance of equities favors the denial of fees. *Thomas* at 648. Attorney fees reasonably incurred in pursuing related claims that "involve a common core of facts or are based on related legal theories." *Thomas* at 649. "To the extent claims are related,

Plaintiff should recover reasonable fees for prosecuting those claims." *Id*. The IDEA authorizes a reduction in a prevailing parents' attorney fees in certain circumstances, including, unreasonably protracting final resolution. §1415(i)(3)(F)(i-iii). A reduction is not permitted if the ALJ found the district violated IDEA procedural safeguards. §1415(i)(3)(G).

The district court found CM's attorney fees reasonable but reduced recovery in OAH-1, finding CM unreasonably protracted litigation in the district court on mooted issues and had a minimal degree of CM's success. (ER93:16-97:5; 96:3-10; 99:23-100:3).[104] The district court reduced CM's attorney fees award to zero, by offset equal award to LSD Defendants' award against CM. (ER100-102).

The district court erred in reducing CM's attorney fees recovery in OAH-1 because CM's issues were not moot and all claims were related. CM's recovery of attorney fees at the administrative level should not be reduced by minimal success in all district court actions. The denial of attorney fees here does not further the IDEA's purpose and the balance of equities does not support a reduction.

The IDEA did not authorize in reduction in CM's attorney fees because ALJ-1 found LSD violated §1415 by the LSD's untimely response to CM's IEE request. §1415(i)(3)(G). CM also was entitled to recover attorney fees under California law

[104]The district court considered CM degree of success on matters that were not billed to the LSD's administrative case or appeal.

adopts the catalyst theory for recovery and IDEA permits states to provide greater relief. The California Supreme Court has rejected the *Buchannon* holding for determining prevailing party status and confirmed the catalyst theory applies to awards of attorney fees as substantive California law. *Graham v. DaimlerChrysler Corp.*, 34 Cal.4th 553, 568-577(2005).

California's catalyst theory for determining "prevailing party" status applied here to claims the district court found moot. The district court erred by denying fees under *Buchannon.*

## XXVI. <u>CONCLUSION</u>

CM was entitled to appropriate special education and related services from kindergarten through the third-grade. His achievement was thwarted by defective assessment, low expectations and random interventions and obstruction of his parents participation in his education decisions. The district court's holdings to the contrary should be reversed and CM should reasonable recover attorney fees. Determination of CM's retaliation claims should be remanded.

## REQUEST FOR ORAL ARGUMENT

CM requests oral argument on his claims addressed by this appeal.

## STATEMENT OF RELATED CASE

No related cases are currently pending. Appeal 10-16903 was decided by this Court on July 14, 2011 and concerned the same parties, similar claims, and a common district court order which is one subject of the current consolidated appeal. No other related cases are known.

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1. This brief exceeds with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B), as modified by this Court's order granting in part Appellants' motion to exceed type volume limitations up to 19,000 words. This brief contains 18757 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced type face using WordPerfect word processing software in Times New Roman type style.

Dated: March 5, 2013

/s/

**Lina Foltz, Attorney for Appellants**